**ALABAMA LIBERTARIAN PARTY, et al., Plaintiffs,**

v.

**The CITY OF BIRMINGHAM, ALABAMA, et al., Defendants.**

**Civ. A. No. CV88–PT–0643–S.**

United States District Court, N.D. Alabama, S.D.

Sept. 6, 1988.

D.M. Samsil, Wiginton & Samsil, Ted Pearson, Birmingham, Ala., for plaintiffs.

Milford G. Bass, Jr. and Charles H. Wyatt, Jr., Birmingham, Ala., for defendants.

MEMORANDUM OPINION

PROPST, District Judge.

This matter is before the court on defendants' Motion for Summary Judgment filed July 12, 1988.

The facts in this case appear undisputed. A special election was held in the City of

---

Birmingham, Alabama (City) on May 12, 1987. The purpose for this election was to submit a proposition to impose a one-half mill property tax for library enhancement and to levy a charge to all telephone subscribers for enhanced 911 emergency telephone service. Before this election, the City launched a promotional campaign to encourage passage of the propositions. This campaign included an advertisement in the Birmingham News on Sunday, May 10, 1987, which read "SAY YES to the Future. SAY YES to our Libraries, SAY YES to Enhanced 911 Service. VOTE YES on May 12! ... Paid Political Advertisement [1] by the City of Birmingham." Plaintiffs allege that this same advertisement was also broadcast over radio station WERC.

Another special election was held on May 10, 1988 for the purpose of approving a $110,000,000 bond issue. Prior to this election, the City distributed leaflets headed "Build a Better Birmingham—Vote FOR Progress on May 10 ... Vote FOR the bond issue and funding on May 10! ... It's a small price to pay for so much progress!" [2] Furthermore, a brochure entitled "Questions & Answers About 911" was distributed. This brochure exhorted "VOTE YES ... For further information call:

    Citizens for 9-1-1 Committee
    Birmingham–Jefferson County
    Emergency Management Agency
      254–2039

This brochure is published as a service to the Voters to explain the Enhanced 911 referendum." The return address on this flyer is 709 North 19th Street, Birmingham, Alabama 35203. Plaintiffs allege that this is City Hall's address.[3] Plaintiffs further contend that these brochures were printed on city presses and equipment by city employees and stamped by a city postage meter.[4] It is plaintiffs' contention that the funds utilized to promote the City's position at these elections came from the City's tax revenues, and that their use constituted a misuse of municipal funds and a violation of plaintiffs' First Amendment rights. By this action, plaintiffs seek to permanently enjoin the City from similar activities in the future, and an accounting and restitution of all expended funds.

The defendants have moved this court to grant summary judgment in their favor. Before addressing the merits, however, the court must first determine whether the plaintiffs have standing to bring this action. The plaintiffs allege that they spent approximately $8,000 to campaign against the proposed referendum. Defendants question whether these campaign expenditures are sufficient to show any real injury to plaintiffs. However, plaintiffs' standing is further premised upon their status as voters and taxpayers of the City of Birmingham. The injury alleged by the plaintiffs herein which the court considers pertinent is the alleged unconstitutional use of their tax dollars. In *Frothingham v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923), the U.S. Supreme Court addressed the requisite injury of a taxpayer who seeks redress:

> The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.

However, the *Frothingham* Court distinguished a municipal taxpayer from a federal taxpayer:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not

---

**1.** The fact that the advertisement was labeled as "political" does not necessarily make it so. The term is generally used by the media in connection with such advertisements.

**2.** The bond issue was to provide funds for schools, museums, parks, parking facilities, sew-

ers, libraries, neighborhood development and economic renewal.

**3.** The court has not verified it as such, but does not question the allegation.

**4.** Defendant has not disputed this contention.

inappropriate. It is upheld by a large number of state cases and is the rule of this court.

*Id.* at 486, 43 S.Ct. at 601.

The rule upholding municipal taxpayer standing appears to rest on the assumption that the relatively small number of taxpayers involved, and the close relationship between residents of a municipality and their local government results in a direct and palpable injury whenever tax revenues are misused.

*Taub v. Kentucky,* 842 F.2d 912, 918 (6th Cir.1988)

Accordingly, this court finds that the plaintiffs herein have standing to assert their claims.

■ The gravamen of plaintiffs' complaint is that the City's expenditures in promoting the passage of the propositions violate their First Amendment rights. The U.S. Supreme Court considered the protection of an individual's right of association in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Therein, the Court discussed whether organizations in which membership is mandatory, may utilize the mandatory dues paid to advance *political* causes opposed by some members. The Court held such a use violated the members' First Amendment right of association:

> One of the principles underlying the Court's decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 [1976], was that contributing to an organization for the purpose of spreading a political message is protected by the First Amendment. Because "[m]aking a contribution ... enables like-minded persons to pool their resources in furtherance of common political goals," *id.* at 22, 96 S.Ct. at 636, the Court reasoned that limitations upon the freedom to contribute "implicate fundamental First Amendment interests," *id.* at 23, 96 S.Ct. at 636.

The fact that the appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. *See Elrod v. Burns, supra,* 427 U.S. [347] at 356–357, 96 S.Ct. [2673] at 2681–82; *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 1248, 22 L.Ed.2d 542 [1969]; *Cantwell v. Connecticut,* 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213. And the freedom of belief is no incidental or secondary aspect of the First Amendment's protections:

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628.

*Id.* at 234–35, 97 S.Ct. at 1799.

The Court ultimately held that these principles "... prohibit the appellees from requiring any of the appellants to contribute to the support of an *ideological* cause he may oppose ..." (Emphasis added) *Id.* at 235.[5] The holding did not completely prohibit unions from expending funds for political purposes. "Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment." *Id.*

During its last turn, the Court reiterated its position in *Abood, supra.* In *Lyng v. Automobile Workers,* —— U.S. ——, ——, 108 S.Ct. 1184, 1191, 99 L.Ed.2d 380, 390 (1988), the Court explained:

---

**5.** There is no suggestion in any advertisement here that the plaintiffs support the City's position. To the contrary, the advertisements are an appeal to all the citizens of Birmingham to make a decision to support the City's proposals.

In *Abood*, the challenged state law required certain employees to pay a fee to their representative union. We ruled that this law violated the First Amendment insofar as it allowed those funds to be used to promote *political* and *ideological purposes* with which the employees disagreed and to which they objected, because by its terms the employees were "compelled to make ... contributions for political purposes."

(Emphasis added).

The critical distinction between *Abood* and the case *sub judice* is not whether the plaintiffs were compelled to contribute, but whether a portion of plaintiffs' tax funds were expended for "political" and "ideological" purposes. The *Abood* court, elaborating upon previous holdings in *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) and *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), stated:

The record in *Hanson* contained no evidence that union dues were used to force *ideological* conformity or otherwise to impair the free expression of employees, and the Court noted that "[i]f 'assessments' are in fact imposed for purposes not germane to collective bargaining, a different problem would be presented."

\* \* \* \* \* \*

The Court faced a similar question several years later in the *Street* case, which also involved a challenge to the constitutionality of a union shop authorized by the Railway Labor Act. In *Street*, however, the record contained findings that the union treasury to which all employees were required to contribute had been used "to finance the campaigns of *candidates* for federal and state offices whom [the plaintiffs] opposed, and to promote the propagation of political and economic *doctrines, concepts* and *ideologies* with which [they] disagreed." 367 U.S., at 744 [81 S.Ct. at 1787].

*Abood, supra* 431 U.S. at 219, 97 S.Ct. at 1791. (emphasis added). In *Abood*, the

Court emphasizes the political and ideological content of the matters at issue and distinguishes *Hanson, supra* on this basis. Here, the issues involved, like the collective bargaining issue in *Hanson*, are related to the common needs of all citizens, rather than being political or ideological in nature. The *Abood* opinion recognizes that even

[t]o compel employees financially to support their collective bargaining representative has an impact upon their First Amendment interests.... But the judgment clearly made in *Hanson* and *Street* [*supra*] is that such interference as exists is constitutionally justified by the legislative assessment of the importance of the union shop to the system of labor relations established by Congress. The furtherance of the common cause leaves some leeway for the leadership of the group. As long as they act to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy.

431 U.S. at 222–23, 97 S.Ct. at 1793. Here, the City leadership has determined to promote a cause consistent with the common needs of its citizens. It is not requiring plaintiffs to be the courier for an ideological or political message (*Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977)).

The court does not believe that the City's advertising campaign was political or ideological in nature.[6] This was not a case where municipal funds were used to support a particular candidate, doctrine or ideology. Rather, the City merely solicited its citizens to provide funds to supply perceived needs common to all. The City and its officials not only have the right, but the duty, to determine the needs of its citizens and to provide funds to service those needs. The funds must come from some source. The City officials are charged with the responsibility of providing those funds by some means. If they cannot directly tax

---

6. The court does not conclude that if the advertising were to be so deemed, that its conclusion

would, of necessity, be different.

through ordinance, they have the incidental right to solicit the votes of citizens to provide those means.[7] The City officials had already taken, through the passage of ordinances, public positions on the issues. The advertisements do no more than to publicize the positions they have previously taken.

As noted in *Buckley v. Valeo*, 424 U.S. 1, 90–93, 96 S.Ct. 612, 668–70, 46 L.Ed.2d 659, virtually ever public expenditure will "to some extent involve a use of public money as to which some taxpayers may object. Nevertheless, this does not mean that those taxpayers have a constitutionally protected right to enjoin such expenditures." *FCC v. League of Women Voters of Calif.*, 468 U.S. 364, 385 n. 16, 104 S.Ct. 3106, 3120 n. 16, 82 L.Ed.2d 278 (1984). Here, the plaintiffs apparently disagreed with both the advertising expenditures and the expenditures which would have been allowed if the City had been successful at the elections. The question that might be posed is whether the City would have violated the plaintiffs' First Amendment rights if they had expended public funds to lobby the legislature for legislative authority to tax or had proposed constitutional amendments which would have allowed the City to levy taxes in order to provide the needed funds. The City in effect made a finding that the funds were needed and that it should seek the support of its citizens in acquiring these funds. This is clearly a public function.

In *FCC, supra* the Court notes a distinction between a ban on political endorsements and a ban on editorial opinions. Justice Stevens stated in dissent, "In view of the fact that the major difference between the ban on political endorsements is based on the content of the speech, it is apparent that the entire rationale of the Court's opinions rests on the premise that it may be permissible to predicate a statutory restriction on candidate endorsements on the difference between the content of the kind

of speech and the content of other expressions of editorial opinion." 468 U.S. at 411–412, 104 S.Ct. at 3134. While defendants might be forbidden to spend funds to support candidates, oppose initiative proposals, etc., they are not forbidden to publicize and seek public support for their own governmental proposals. Alleged First Amendment violations are subject to a content analysis. Defendants' actions pass muster.

Plaintiffs also rely on *District of Columbia Common Cause v. District of Columbia, et al.*, No. 85–3528 (D.C. 1986) to support their First Amendment claim.[8] *Common Cause* involved efforts by the District of Columbia to persuade voters to vote against an initiative measure which would require the local government to guarantee overnight shelter for homeless people. The pamphlets and flyers distributed "did not purport to present the pros and cons of the initiative but [were] devoted solely to a presentation of the reasons why D.C. voters should vote against Initiative 17 and an exhortation to Vote No on Initiative 17! …" These materials bore the statement "Distributed by the District of Columbia!" *Id.*, Slip. Op. at 2. The court held that the promotion of only one side of a contested election issue amounted to "a content-based government subsidy" and was therefore violative of the First Amendment rights of D.C. voters. In so holding, the court explained:

> Plaintiffs' First Amendment claim is controlled by *Greenberg v. Bolger*, 497 F.Supp. 756 (E.D.N.Y. 1980), in which the court held that the preferential mailing rates allowed to selected political parties constituted a content-based burden on the First Amendment rights of parties and candidates who were not provided with a similar postal subsidy. Here, there can be no doubt that the challenged expenditures were made on the basis of political ideas, and not some content-neu-

---

7. The court does not here address the statutory right; only whether the U.S. Constitution is violated in such instances.

8. This case was argued before the D.C. Circuit Court of Appeals on August 26, 1987, Case No. 86–7104. The appellate court has not yet rendered its decision.

tral criteria. The government aligned itself in the political fray as being opposed to the enactment of Initiative 17, providing groups sharing this viewpoint with the valuable use of government facilities, equipment, materials and employees, thereby unfairly tipping the scales of the electoral balance in favor of one side of the initiative election. The government has an obligation to remain neutral and not spend public funds advocating or opposing an initiative on the ballot. Such expenditures must therefore be declared unlawful and permanently enjoined.

*Id.* Slip Op. at 5.

Defendants contend that *Common Cause* is distinguishable from the case *sub judice.* It is urged that one distinguishing factor is the source of the ballot proposition. *Common Cause* dealt with an initiative election, defined as ...

> An electoral process whereby designated percentages of the electorate may initiate legislative or constitutional changes through the filing of formal petitions to be acted on by the legislature or the total electorate.

BLACKS LAW DICTIONARY 705 (5th ed. 1979).[9]

The *Common Cause* court repeatedly emphasizes that the election was called through an initiative process.[10] The *Common Cause* opinion apparently proceeds on the basis that the District of Columbia had expended funds on behalf of only one of two opposing factions. Thus the statement that the "First Amendment claim is *controlled* by *Greenberg v. Bolger,* 497

F.Supp. 756 (E.D.N.Y.1980)...." (emphasis added).[11] What is not significantly discussed is that the adoption of the measure "would require the District of Columbia government to guarantee overnight shelter for homeless people." The fact that some citizens would have one view of the subject and other citizens another view, would not appear to necessarily require that the governmental entity whose funds and services would be impacted remain neutral. The requirement of neutrality is not as clear as it may be in *Greenberg. (Greenberg* was also not appealed). The *Common Cause* court emphasizes that "the challenged expenditures were made on the basis of *political ideas* not some content-neutral criteria. The government *aligned* itself in the *political fray* ... thereby unfairly tipping the scales of the electoral balance in favor of *one side* of the *initiative* election." (emphasis added). The court concludes, "The government has an obligation to remain neutral and not spend public funds advocating or opposing an *initiative* on the ballot." (emphasis added). The court also found a D.C. statutory basis for its decision.[12]

What the *Common Cause* court appears to assume is that the District of Columbia was siding with opposing factions and ignored, discounted, rejected or did not hear an argument that it was entitled to its own position which, of necessity, coincided with that of one of the opposing factions. While this court may not agree that a governmental entity can never take sides in an initiative election, it certainly cannot agree that a governmental entity cannot expend funds to even publicly endorse its own mea-

---

**9.** In their brief, the plaintiffs incorrectly characterize the elections here as "initiative" measures.

**10.** This court does not intend to suggest that municipalities would always violate the First Amendment if they expend public funds opposing issues raised by initiative induced elections. The decisive matter may be the content or nature of the issue (political? ideological?), not the procedure. This court has a serious doubt as to whether governmental entities should be required to stand silently by while propositions which can impact on their tax structures, funds, services and programs are voted upon, even *if*

initiated by others; unless participation is statutorily forbidden by an appropriate authority. Perhaps an equal protection analysis would be more appropriate than a First Amendment analysis.

**11.** "Controlled" may be an unduly deferential term.

**12.** If the basic principle that constitutional issues should not be reached when cases can be otherwise decided is considered, none of the lower court cases relied upon by the plaintiffs may be entitled to any authoritative weight.

sures.[13]

Initiative elections were also at issue in *Mountain States Legal Foundation v. Denver School Dist.,* 459 F.Supp. 357 (D.Colo.1978), cited by the *Common Cause* court and relied upon by plaintiffs herein. The *Mountain States* court stated:

> A use of the power of publicly owned resources to propagandize against a proposal made and supported by a significant number of those who were taxed to pay for such resources is an abridgment of those fundamental freedoms. Specifically, where the proposal in question—placed before the voters in the exercise of the initiative power—seeks fundamentally to alter the authority of representative government, opposition to the proposal which is financed by publicly collected funds has the effect of shifting the ultimate source of power away from the people.
>
> * * * * * *
>
> When residents within a state seek to participate in this process by proposing an amendment to the state constitution, the expenditure of public funds in opposition to that effort violates a basic precept of this nation's democratic process. Indeed, it would seem so contrary to the root philosophy of a republican form of government as might cause this Court to resort to the guaranty clause in Article IV, Section 4 of the United States Constitution.

*Id.* at 361. (citations omitted).

The special elections at issue in the instant action originated from ordinance(s) of the Birmingham City Council. The elections were not "initiative elections," but rather were part of a process begun by the municipality which determined that the funds sought would be beneficial to the City. Defendants therefore argue that the City had the right, if not the duty, to advise its citizens of the benefits proposed. This court agrees. The library improvements and 911 enhancement were services which the City sought to provide to all of its citizens. Clearly, the City has the responsibility to determine when improvements are necessary or desirable and to express its determination of those needs to the public. In order to implement such proposed benefits, a municipality must attempt to secure the funds from its citizenry. The ads at issue in the instant action merely amount to a solicitation of the necessary funds. Those taxpayers who disapprove of the proposed benefits have two opportunities to dissent: (1) They may dissent at the polls on the issues involved and (2) they may dissent at the polls when City officials seek re-election.

One could reasonably suggest that to forbid defendants the right to support by advertising their position, initiated by their own resolution or ordinance, would be violative of their own First Amendment rights. This argument was made by the appellants in *Campbell v. Joint Dist. 28–J,* 704 F.2d 501 (10th Cir.1983).[14] Since First Amendment issues are subject to a balancing analysis, this court does note a statutory provision which may be apt here. The court decided that the defendants there did not have an "official concern" in the referendum issue. Here, under any definition, the defendants had an "official concern" in the library, 911 and other issues. They had been authorized by law to call, and initiated the elections. *Campbell,* like *Common Cause* and *Mountain States, supra,* involved an election initiated by citizen petitioners. Nor is *Mountain States* persuasive authority for the plaintiffs' position here. It was written with reference to an application for preliminary injunction, and involved a proposal placed on the ballot by voters' petition. It too was at least partially based upon the Court's consideration of a Colorado statute (again, "official

---

**13.** The very call of the election implies a non-neutral position by the City. The City certainly has the right to explain and justify its position. It might be derelict if it fails to do so.

**14.** It is not clear in *Campbell* upon what basis federal jurisdiction is premised. The court's only response to the appellants' First Amendment argument was the *ipse dixit* statement that, "It goes without additional authority that this is not any impediment to their exercise of their first amendment rights." That issue is not so pellucid to this court.

concern").[15]  The court made no obviously clear First Amendment decision.  If it did, it was apparently premised on the right of petition.  The decision was also premised on state statute(s), state constitutional provision(s) and, vaguely, on the U.S. Constitution.  The opinion concludes with a general reference to "a basic precept of this nation's democratic process."  Somehow Article IV, Section 4 of the U.S. Constitution was brought into the picture.[16]  There apparently was no appeal from the decision.

The situation here is similar to that in *Lathrop v. Donohue*, 367 U.S. 820, 843, 81 S.Ct. 1826, 1838, 6 L.Ed.2d 1191 (1961) where the Court stated:

> ... Both in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process.  It cannot be denied that this is a legitimate end of state policy.  We think that the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity.  Given the character of the integrated bar shown on this record, in the light of the limitation of the membership requirement to the compulsory payment of reasonable annual dues, we are unable to find any impingement upon protected rights of association.

It would be a strange system indeed which would allow the City to determine its needs, allow it to adopt ordinances calling for elections to fulfill those needs, allow it to bear the expense of those elections, and then require it to stand silently by before the issues are voted on.  Obviously, the City is not neutral under such circumstances and should not be required to appear so.

The court concludes that the City of Birmingham's use of tax revenues to promote passage of measures to enhance city services does not contravene the principles of the First Amendment.  It is, therefore, this court's holding that defendant's motion for summary judgment on the plaintiffs' First Amendment Claim is due to be granted.

Defendants also seek summary judgment on plaintiffs' claims under § 17–2–5, Code of Ala. (1975).  Defendants correctly point out that this statute, dealing with county boards of education, has no bearing on this matter.

In evaluating the complaint and subsequent pleadings and motions, the court notes both parties discuss the substance of Ala.Code § 17–1–7 (1975) and ignore § 17–2–5.  Section 17–1–7 states in part:

> (b) No person shall attempt to use his official authority or position for the purpose of influencing the vote or political action of any person.  Any person who violates this subsection (b) shall be guilty of a felony and punishable by a fine not to exceed $10,000.00 or imprisonment in the state penitentiary for a period not to exceed two years, or both.

> (c) No person in the employment of the state of Alabama, whether classified or unclassified, shall use any state funds, property or time, for any political activities.  Any person who is in the employment of the state of Alabama must be on approved leave to engage in such political action or such person must be on personal time before or after work and

---

**15.** In *Mountain States*, the court stated, "A special election for the sole purpose of voting on a school bond issue is a convenient illustration of a campaign involving only issues in which they have an official concern."  Those are the type campaigns involved here.

**16.** Article IV, Section 4 provides, "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic violence."  This court cannot connect that section to this issue.

on holidays. It shall be unlawful for any officer or employee to solicit any type of political campaign contributions from other employees who work for said officer or employee to coerce or attempt to coerce any subordinate employee to work in any capacity in any political campaign or cause. Any person who violates the provisions of this section shall be guilty of the crime or trading in public office and upon conviction thereof, shall be fined or sentenced or both, as provided by section 13A–10–63.

Defendants contend that § 17–1–7 is a penal statute and that it therefore fails to provide a remedy to plaintiffs.[17] Plaintiffs allege that they approached both the District Attorney and the State Attorney General concerning enforcement of this statute. Both declined. Plaintiffs also complained to the State of Alabama Ethics Commission about the alleged violations and it too declined to prosecute. Plaintiffs concede that the statute is penal in nature, but assert it "provides an indication of the State's intent to prohibit such expenditures and an [sic] indicia of opposition to such actions." Regardless of the state's intent, this court's jurisdiction does not likely extend to enforcement of a state penal statute. In any event, the court declines pendent jurisdiction of any such purported state claim(s) and will dismiss such claim(s) without prejudice.

Finally, the court notes that plaintiffs' complaint asserts that defendants' actions were *ultra vires.* Neither party has adequately addressed this issue, nor cited any authority for or against this issue. However, it is an elementary principle of municipal law that cities have *only* the authority granted them by statute. Alabama municipalities are vested with power by virtue of Ala.Code § 11–40–1 (1975).[18] Furthermore, the Alabama Supreme Court has held:

It is established that a municipal corporation may exercise these, and only these powers: Those granted in express terms;

those necessarily implied in, or incident to, the powers expressly conferred; and those indispensably necessary to the accomplishment of the declared objects and purposes of the municipality.

*Colvin v. Ward,* 189 Ala. 198, 66 So. 98 (1914).

Defendants alternatively contend that the City's power to promote its stance in these special elections was expressly conferred by the following statute:

All municipalities in the state of Alabama shall be and are hereby authorized and empowered to enter into contracts or agreements with any persons, firms or corporations for the advertisement of such municipality or any function or undertaking of such municipality both within and without the limits of such municipality through the use of any recognized medium of advertising.

Ala.Code § 11–47–9 (1975).

Defendants contend that the City's power to call special elections impliedly encompasses the power to promote its position on those elections. Again, this is a state issue as to which this court declines pendent jurisdiction.

---

17. The court questions the application of this statute to the facts here and whether it provides for an implied private cause of action.

18. Section 11–40–1 reads in pertinent part: "Such municipal corporations shall be invested with the full powers, duties, and authority granted in this title."