**Connie LASH, et al., Plaintiffs,**

v.

**CITY OF UNION, OHIO, et al., Defendants.**

**No. C–3–98–045.**

United States District Court, S.D. Ohio, Western Division.

March 29, 2000.

Thomas W. Condit, Condit & Dressing, Cincinnati, OH, for Plaintiffs.

Neil Frank Freund, Freund Freeze & Arnold, Dayton, OH, Joseph Philip Moore, Sunderland & Moore, Vandalia, OH, for Defendants.

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 29); DECISION AND ENTRY OVERRULING IN PART AND NOT RULING UPON IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 42); DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO STRIKE (DOC. # 45); DECISION AND ENTRY SUSTAINING PLAINTIFFS' MOTION FOR LEAVE TO AMEND (DOC. # 49); DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO STRIKE AFFIDAVITS (DOC. # 53); FURTHER PROCEDURES ESTABLISHED

RICE, Chief Judge.

The Plaintiffs Connie Lash, Julie Johnson, Carla Edwards, Ronald Kidwell, Jerry Vaughn and Charles Arnett are all citizens of the United States of America and residents of the City of Union, Montgomery County, Ohio. They bring this litigation as voters and taxpayers who object to having government property in the City of Union used to promote only one point of view on political issues and to the City's use of taxpayer money to advocate how citizens should vote on issues. The Plaintiffs bring this action against the City of Union and its City Manager, Defendant John Applegate ("Applegate"), who has held that position since 1982.

This litigation arises out of two elections that occurred in 1997 and 1998, both of which related to the provision of fire protection and emergency medical services ("EMS"). For more than fifty years, the City of Union had belonged to a joint fire district with the City of Englewood and Randolph Township. Fire protection and EMS were provided to the joint district by Randolph Township. In 1997, the Union City Council voted to create its own fire department. Plaintiffs favored the exist-

ing joint fire district. Accordingly, they spent many hours of their time in promoting an initiative campaign which subjected the City Council's decision to create the new fire district to a public vote in November, 1997. The November, 1997, ballot initiative was worded such that a "Yes" vote favored keeping the existing joint fire district, whereas a "No" vote favored creating the new fire district for the City of Union, which had been approved by the Union City Council. Ultimately, a majority voted "No" on the November, 1997, ballot initiative, which permitted the creation of a new fire district for the City of Union.

In or around September, 1997, the Union City Council passed a resolution to expend City funds, in the November, 1997, ballot initiative, in order to promote a "No" vote. Approximately five to six thousand dollars in City funds were spent, pursuant to the resolution, to defeat that ballot issue, by disseminating information regarding what the City administration felt were the benefits of an independent fire and EMS district. Some of those City funds were used to finance the mailing of a newsletter (*Focus*) and brochures, containing explanatory material regarding the public purpose at issue, in addition to announcing the City's position on the fire and EMS issue and advocating a "No" vote on the ballot initiative. Applegate also authorized City of Union employees to use city equipment during work hours to hang a campaign banner across a major thoroughfare. The Union City Council had not wanted the fire protection initiative issue to be put on the ballot in November, 1997. As a result, the City spent approximately $20,000.00 in litigation costs in an attempt to keep the fire protection issue off the November ballot, altogether. That issue was finally resolved, in favor of allowing the ballot initiative to be put to the voters, by the Ohio Supreme Court. *See State ex rel. Arnett v. Winemiller,* 80 Ohio St.3d 255, 685 N.E.2d 1219 (1997). The Plaintiffs in this litigation, except Carla Ed-

wards, and Ronald Kidwell, were also plaintiffs in that litigation. They were represented by Coolidge, Wall, Womsley & Lombard Co., L.P.A. The fees, which that law firm charged to advocate Plaintiffs' position in that litigation and to draft the initiative petition, were paid by the Randolph Township joint fire district.[1] Prior to the November, 1997, election, Applegate permitted a "Vote No" sign to be displayed on City property, in a grassy area directly in front of the Union City Building. Meanwhile, he removed the Plaintiffs' "Vote Yes" signs from that location on more than one occasion, in accordance with directives given him by City Council. The City did not restrict or interfere, in any way, with the Plaintiffs' presence and political advocacy, while in attendance at the City Council meetings prior to the November, 1997, election, when Plaintiffs attended Council meetings and passed out literature advocating the merits of a "Yes" vote, a vote which was in opposition to Council's then stated position. In addition to placing signs directly beside the City Building, after the "Vote Yes" signs were removed from the front lawn of that building, the Plaintiffs conducted a protest on that front lawn with no opposition from the Defendants. While the Plaintiffs picketed on the front lawn of the City Building, they carried "Vote Yes" signs with no opposition or restriction from Defendants.

During the hearing that this Court conducted on Plaintiffs' request for a preliminary injunction, Defendant Applegate testified that he believes that his and the City's conduct, in expending City funds to promote the City's position on ballot issues, was lawful under Section 5.09 of the Union City Charter, adopted by the residents of that City in November, 1981, which states, in pertinent part:

> Section 5.09. Public Information on Issues. The Council shall have the power to appropriate and authorize the expenditure of public funds to provide information to the members of the public in connection with elections on proposed tax levies and bond issues for the purposes of the Municipality, and other issues affecting the Municipality and not involving the election of candidates for a public office, or the recall of a member of the Council.

In accordance with Section 5.09, the City has, over the years, expended public funds to promote certain ballot issues for public purposes. For example, over the last 16 years, the City of Union has expended public funds to promote such public purposes as police levies, street levies, income tax issues and fire protection and EMS levies. If an issue involving a public purpose is placed on the ballot, the City will take a position on the issue when it is deemed necessary to protect the health and common good of its citizens. After the City establishes its position on the issue, a resolution is then proposed (and enacted) to authorize the expenditure of public funds to promote that public purpose and the City's position thereon.

The second election that is implicated by this litigation was a tax levy that was on the ballot in the City of Union, during the May, 1998, election, regarding the financing of the new fire district, which the voters had implicitly approved by their rejection of the 1997 ballot initiative. Specifically, the levy was for the express purpose of providing funds for fire protection and EMS services to the residents of the City of Union. This levy was placed on the ballot by the affirmative, majority vote of the Union City Council. On March 23, 1998, this Court entered a Decision in which it denied the Plaintiffs' request for a preliminary injunction, prohibiting the City of Union from expending public funds in support of that levy. See Doc. # 14. The Plaintiffs appealed that Decision to the Sixth Circuit, which denied their re-

---

1. According to the affidavit of Eric Smith, the City Manager of Englewood, an audit of the joint fire district reveals that $54,349.96 was expended by the joint fire district to pay for the services rendered by that law firm in connection with the 1997 ballot initiative.

quest for an injunction pending appeal. *See* Doc. # 21. Thereafter, the Plaintiffs voluntarily dismissed their appeal. *See* Doc. # 23.

This case is now before the Court on a number of motions, including Defendants' Motion for Summary Judgment (Doc. # 29) and Plaintiffs' Motion for Partial Summary Judgment (Doc. # 42).[2] With their motion, the Defendants seek summary judgment on the aspect of this litigation which is based upon the assertion that they violated the Plaintiffs' rights under the First Amendment, by expending public funds to oppose the 1997 initiative and to support the 1998 tax levy. The Plaintiffs seek summary judgment on those issues and others. Herein, the Court rules upon the Defendants' motion and that part of the Plaintiffs' motion which is the mirror image of that filed by the Defendants. In addition, the Court establishes procedures which will lead to the resolution of the remaining issues in this litigation. The Court begins its analysis by setting forth the standards which are applicable to all motions for summary judgment.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those por-

tions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

---

2. Although the Plaintiffs do not expressly so state, their Motion for Partial Summary Judgment (Doc. # 42) also serves as their memorandum in opposition to Defendants' Motion for Summary Judgment. In their motion, the Plaintiffs address the issues raised by the Defendants in their motion, as well as some additional ones. The Court, at the Plaintiffs' request, extended the time in which they had to respond to Defendants' motion until November 7, 1998. *See* Notation Entry Appearing on Doc. # 32. The Plaintiffs filed their motion on November 6, 1998. Therefore, al-

though the Plaintiffs have not filed a freestanding document opposing Defendants' Motion for Summary Judgment, their position on the issues has been clearly set forth.

In addition, it should be noted that the Defendants' motion, although captioned a "Motion for Summary Judgment" is in reality one for partial summary judgment, since they do not seek judgment on Plaintiffs' claim that their rights under the First Amendment were violated as a result of the Defendants' removal of signs from in front of the City Building during the 1997 election.

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the factfinder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Prac-*

*tice and Procedure*, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment....."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

As is indicated above, the Court limits its discussion herein to the Plaintiffs' claims arising out of the expenditure of public funds to oppose or to promote a ballot issue, such as a citizen initiative or a tax levy. The Plaintiffs claim that the practice of expending municipal funds to promote a particular political viewpoint during a contested election violates their rights under the Free Speech Clause of First Amendment to the United States Constitution. The starting point of the Court's analysis must be the Free Speech Clause, which provides that "Congress shall make no law ... abridging the freedom of speech...." [3] By its language, that Clause constrains the government from preventing a person from expressing

---

**3.** It is well settled that the limitations on government conduct contained in the First Amendment apply to municipalities such as Union.

his or her point of view.[4] The Plaintiffs have not presented evidence, either during the hearing on their request for a preliminary injunction, or subsequently, raising a genuine issue of material fact as to whether the Defendants' conduct in providing financial support to particular political viewpoints has, in any manner, prevented them (Plaintiffs) from speaking or expressing their own opposition viewpoint. Since the conduct of the Defendants did not contravene the express language of the Free Speech Clause, one could argue that the Plaintiffs do not have a viable claim thereunder. In its Decision overruling the Plaintiffs' request for a preliminary injunction, the Court concluded that such an argument would be unavailing, since the Supreme Court has taken a broader view of that constitutional provision. In particular, this Court noted that, in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Supreme Court held that a state could not, consistent with the Free Speech Clause, force public sector employees to finance the ideological activities of the union that represented them, if those ideological activities were not germane to the duties of the union as their collective bargaining representative.[5] Therein, the Supreme Court did, however, hold that it was constitutionally permissible for a state to require public sector employees to pay dues to support the ideological activities of their union, as long as those activities were germane to its role as the collective bargaining representative. Since the trial court had decided *Abood* on a motion for judgment on the pleadings, the Supreme Court did not have cause to decide what type of ideological activity fell into which category. Nevertheless, the *Abood* Court did cite examples of ideological positions which, if taken by a union in the course of negotiating a contract, would be germane to its role as a collective bargaining representative (i.e., coverage for abortion as part of medical benefits or the desirability of negotiating limits on the rights of employees to strike). 431 U.S. at 222, 97 S.Ct. 1782. Even if an employee represented by the union found those positions to be morally reprehensible, that employee's rights under the Free Speech Clause would not be violated, as a result of being forced to contribute dues which supported the union in negotiating such a contract. *Id.See also, Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). In accordance with *Abood*, this Court concluded, in its Decision overruling Plaintiffs' Motion for Preliminary Injunction, that the Plaintiffs herein possibly had a claim under the Free Speech Clause, based upon the use of public funds by the Defendants to support a view not held by them, despite the fact that the Defendants' conduct did not prevent the Plaintiffs from espousing their own viewpoint in opposition to that of the Defendants. Applying the principles announced in *Abood*, this Court found that the Plaintiffs had failed to establish a substantial likelihood that the expenditure of public funds, generated through compulsory taxation, to support the prospective 1998 tax levy was not germane to the purposes for which the City of Union exists.

---

4. In *Buckley v. Valeo*, 424 U.S. 1, 92–93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court, *inter alia*, rejected the plaintiffs' argument that public financing of presidential campaigns would violate the Free Speech Clause, because the government would be expending funds to support particular political viewpoints. In so concluding, the *Buckley* Court noted that the Free Speech Clause is not analogous to the Establishment Clause of the First Amendment, which prohibits the government from supporting a particular *religion. Id.*

5. This Court also noted that the Free Speech Clause prohibits governments from forcing their citizens to adopt or to espouse a particular political belief. *See e.g., West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (state may not require a student to recite the pledge of allegiance); *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state may not require a citizen to display "Live Free or Die" on his license plate).

■ In their Motion for Partial Summary Judgment (Doc. # 42), the Plaintiffs argue that a municipality violates the Free Speech Clause whenever it expends funds, which have been collected through compulsory taxation, to support or to oppose any political or ideological matter, regardless of whether the particular issue is germane to the purposes of the municipality.[6] This Court does not agree. Not only have the Plaintiffs failed to cite any authority in support of that broad proposition, but it is also contrary to a statement by the Supreme Court in *Keller*. That case arose out of the manner in which the compulsory dues, which every lawyer in California was required to pay to the State Bar of California ("Bar"), were being used. The plaintiffs alleged that their rights under the Free Speech Clause were being violated, because a portion of those dues was being used to support ideological issues, which according to the plaintiffs, were not germane to the purposes of the Bar. The California Supreme Court concluded that the plaintiffs' constitutional challenge was without merit, because the Bar was a governmental agency that had been engaging in "government speech," which the Free Speech Clause does not forbid, even though the speech is not content neutral and is paid for by funds that are collected through compulsion (dues or taxes). On appeal, the United States Supreme Court reversed, concluding that for purposes of the First Amendment, the Bar was like the union in *Abood*, rather than being similar to a governor or a mayor, whose salaries are paid with public funds and who are expected to espouse views which may not be held by all of their constituents, and that, therefore, the principles set forth in that case were applicable. However, the Supreme Court did not reject the "government speech" doctrine out of hand. On the contrary, it seemed to endorse that doctrine, albeit not for an entity such as the Bar:

> But the very specialized characteristics of the State Bar of California discussed above served to distinguish it from the role of the typical government official or agency. Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process. If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed. Cf. *United States v. Lee*, 455 U.S. 252, 260, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) ("The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief").

496 U.S. at 12–13, 110 S.Ct. 2228. *See also, Abood*, 431 U.S. at 259 n. 13, 97 S.Ct. 1782 (Powell concurring in the judgment)

---

**6.** In support of that argument, the Plaintiffs rely upon *Citizens to Protect Public Funds v. Board of Educ.*, 13 N.J. 172, 98 A.2d 673 (1953), wherein future Supreme Court Justice William Brennan concluded that a local school board did not have inherent authority under *state law* to spend public funds to promote the passage of a bond issue. Rather, the New Jersey Supreme Court concluded that the local school board could have expended such funds only if the legislature had expressly authorized it to do so. Herein, the Plaintiffs rely solely on the First Amendment (as opposed to state law). Therefore, *Citizens to Protect Funds* does not establish the standards which this Court must apply. Moreover, even if the Plaintiffs had relied upon state law, this Court would have concluded that *Citizens to Protect Funds* is not persuasive. Section 5.09 of the Union Charter (a law of a governmental entity) specifically authorizes the Defendants to spend public funds, during elections involving *tax levies and other issues affecting the* City of Union. Union, as a charter city under Ohio law, is permitted to legislate in this area.

(distinguishing between being compelled to support ideological positions of a union, through mandatory dues, on the one hand, from being compelled to support the ideological or political positions of government, through compulsory taxation, on the other, because government is the representative of the people); *F.C.C. v. League of Women Voters of California,* 468 U.S. 364, 385 n. 16, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (noting that, although virtually every expenditure of public funds will to some extent involve the use of public money to which some taxpayers may object, that does not mean that the objecting taxpayer has a right to obtain an injunction to prevent such use, upon a claim that such expenditure of public funds violates the Free Speech Clause). Accordingly, the Court rejects the Plaintiffs' broad assertion that all governmental spending on political or ideological issues violates the Free Speech Clause contained in the First Amendment. Rather, for present purposes, the Court will decide whether the Defendants violated the Plaintiffs' rights under the Free Speech Clause, in accordance with the standards set forth in *Abood.* The Court purposefully utilizes the phrase "for present purposes." The Defendants have neither cited *Keller* nor argued that their actions were permissible as a matter of law, because they constitut-ed government speech. Therefore, the Court does not, at this time, consider that issue.[7] As a means of analysis, the Court will initially discuss the question of whether the Defendants violated the standard established by *Abood* when it expended taxpayers' funds to support the 1998 tax levy, following which it will turn to the expenditure of such funds to oppose the citizen-sponsored initiative in November, 1997.

### I. 1998 Tax Levy

■ In overruling the Plaintiffs' request for a preliminary injunction, this Court relied upon *Alabama Libertarian Party v. Birmingham,* 694 F.Supp. 814 (N.D.Ala. 1988), albeit diverging slightly from the reasoning employed therein. In that case, the plaintiffs alleged that the defendants, the city of Birmingham and its city officials, had expended public funds to support the passage of two tax levies, a bond issue which would raise funds for public libraries and an increased tax for enhanced 911–service.[8] The plaintiffs sought an injunction to prevent the defendants from repeating that conduct in future elections, contending that it violated their rights under the Free Speech Clause. The District Court disagreed. That court noted that the defendants were alleged to have violated the Free Speech Clause during a cam-

---

7. Since the Defendants have not argued that they are entitled to summary judgment on the Plaintiffs' claims arising out of the expenditure of public funds on the basis of *Keller,* the Plaintiffs have not been afforded the opportunity to respond to such an argument. This Court deems it inappropriate to address such an issue without having had the benefit of briefing from the parties. It is possible that the Defendants are entitled to summary judgment under *Keller,* even though they may have violated the standards set forth in *Abood.* Below, the Court concludes that the Defendants' expenditure of funds to oppose the 1997 initiative violated the principles established in *Abood.* Nevertheless, it will not enter summary judgment in favor of the Plaintiffs on that claim, without first affording the parties the opportunity to address *Keller* and the government speech doctrine. Therefore, it directs the parties to file supplemental, cross motions for summary judgment, ad-dressing *Keller,* within 30 days from date. Parenthetically, the Court concludes below that the expenditure of funds to support the 1998 tax levy did not violate the principles established by *Abood;* therefore, the Defendants are entitled to summary judgment on the Plaintiffs' claim arising out of that activity, regardless of the applicability of *Keller,* because the government speech doctrine set forth in that case affords the Defendants more protection from a claim predicated upon an alleged violation of the Free Speech Clause.

8. The defendants had allegedly paid for advertisements in newspapers and on the radio. In addition, they used city employees and resources (such as postage) to distribute leaflets. Since the District Court granted the defendants' motion to dismiss, it accepted those allegations as true.

paign for two tax levies. Since each of those levies was designed to provide for the common good (libraries and 911–service), the District Court concluded that the defendants had not been promoting their ideology by supporting them financially:

> Here, the City leadership has determined to promote a cause consistent with the common needs of its citizens. It is not requiring the plaintiffs to be the courier for an ideological or political message.
>
> The court does not believe that the City's advertising campaign was political or ideological in nature. This was not a case where municipal funds were used to support a particular candidate, doctrine or ideology. Rather, the City merely solicited its citizens to provide funds to supply perceived needs common to all. The City and its officials not only have the right, but the duty, to determine the needs of its citizens and to provide funds to service those needs. The funds must come from some source. The City officials are charged with the responsibility of providing those funds by some means. If they cannot directly tax through ordinance, they have the incidental right to solicit the votes of citizens to provide those means. The City officials had already taken, through the passage of ordinances, public positions on the issues. The advertisements do no more than to publicize the positions they have previously taken.

*Id.* at 817–18 (footnotes and citation omitted). On the basis of its conclusion that the purpose of the tax levies was to promote the common good through levies that had been placed on the ballot by elected city officials in the discharge of the obligations for which they had been elected, rather than to promote an ideological agenda, the *Alabama Libertarian Party* court distinguished *Abood, supra,* wherein the Supreme Court had concluded that the state could not force a public sector employee to contribute to the ideological activities of the union that represented him, which were unrelated to its duties as a collective bargaining representative.

Herein, the Defendants' expended public funds to support a tax levy (one involving fire protection and EMS services). As it did when it ruled upon Plaintiffs' request for a preliminary injunction, this Court continues to find the result reached in *Alabama Libertarian Party* to be persuasive and will follow that decision. However, as is explained below, this Court deems the expenditure of public funds to support the May, 1998, tax levy to be fully consistent with the principles established by *Abood;* therefore, unlike *Alabama Libertarian Party,* this Court does not attempt to distinguish *Abood.* Indeed, the Court will rely in substantial measure on that decision. The 1998 tax levy was placed on the ballot by an affirmative vote of the Union City Council, for the express purpose of raising funds to provide fire protection and EMS to the residents of that community. Placing of the May, 1998, tax levy on the ballot was unquestionably germane to the role of the elected officials of the City of Union, as was the use of public funds to support its passage. That levy was for the purpose of raising funds to pay for fire protection and EMS and, thus, to provide protection to the residents of that community. This Court can conceive of few matters more germane to the fundamental function of local government than providing for the safety and protection of its citizens. Therefore, the Court concludes that the expenditure of funds for this purpose, a portion of which the Plaintiffs were compelled to contribute through taxation, did not violate the Free Speech Clause. This Court's conclusion is buttressed by the Ninth Circuit's application of *Abood* in the context of a challenge to the use of compulsory student activity fees to support certain student organizations. *Rounds v. Oregon State Board of Higher Education,* 166 F.3d 1032 (9th Cir. 1999). Therein, the plaintiffs, students at the University of Oregon, alleged that the defendants had violated their rights under the First Amendment, by using a portion

of their compulsory student activity fees to fund the Oregon Public Interest Research Group Education Fund ("OPIRGEF"). The District Court entered summary judgment in favor of the defendants. The Ninth Circuit affirmed that decision, since the OPIRGEF was germane to the University's purpose, because that organization helped educate students in the manner in which they could participate in matters of public concern. *See also, Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir.1996) (holding First Amendment was not violated by requiring the plaintiff to pay dues to an integrated bar, even though those dues were used to support matters such as distributing materials on the Bill of Rights to students and providing assistance to alcoholic lawyers, since those matters were germane to the role of the integrated bar).

Accordingly, having concluded that the Defendants' expenditure of public funds to promote the May, 1998, levy was germane to the governmental functions of the City of Union, the Court sustains the Defendants' Motion for Summary Judgment (Doc. # 29) and overrules the Plaintiffs' Motion for Partial Summary Judgment (Doc. # 42), as those motions relate to the Plaintiffs' claim that the expenditure of public funds to support the 1998 tax levy violated their rights under the Free Speech Clause of the First Amendment.

## II. 1997 Citizen–Sponsored Initiative

■ In *Mountain States Legal Foundation v. Denver School District*, 459 F.Supp. 357 (D.Colo.1978), the plaintiffs sought a preliminary injunction to prevent the defendants from expending public funds to defeat a citizen-sponsored initiative which would have fundamentally altered the authority of all levels of government within the state of Colorado to spend public funds.[9] Therein, the plaintiffs asserted that the expenditure of public funds violated their rights under the Free Speech Clause. The District Court agreed and granted the requested preliminary injunction, writing:

> A use of the power of publicly owned resources to propagandize against a proposal made and supported by a significant number of those who were taxed to pay for such resources is an abridgment of those fundamental freedoms. Specifically, where the proposal in question placed before the voters in the exercise of the initiative power seeks fundamentally to alter the authority of representative government, opposition to the proposal which is financed by publicly collected funds has the effect of shifting the ultimate source of power away from the people.

> \*     \*     \*     \*     \*     \*

> When residents within a state seek to participate in this process by proposing an amendment to the state constitution, the expenditure of public funds in opposition to that effort violates a basic precept of this nation's democratic process.

*Id.* at 360–61. In *Mountain States*, the very governmental entities that would have been affected by that initiative were spending funds to defeat it. The initiative petition, the right of the citizens to bypass the legislative branch of government in order to place an issue on the ballot, an issue which the legislature either has not or is not likely to pass, would be "beaten back" with public funds, used by the same legislature whose action or inaction the people were opposing with their initiative.

To determine whether the Defendants violated the principles established in *Abood,* by expending public funds to op-

---

**9.** In its Decision overruling the Plaintiffs' request for a preliminary injunction to prevent the expenditure of public funds on the then upcoming tax levy, this Court distinguished *Mountain States,* since that litigation arose out of a citizen initiative rather than a tax levy. At this point in its Decision, the Court will address the issue of whether the Defendants violated the Free Speech Clause by expending public funds to oppose a citizen initiative.

pose the 1997 initiative, this Court finds the result reached by the District Court in *Mountain States* to be persuasive. Herein, the citizen initiative arose out of the decision of the Union City Council to withdraw from the joint fire district. The Plaintiffs, disagreeing with that decision, managed to get the issue placed on the ballot. The City of Union, the very entity of government that would have been affected by that initiative, expended public funds to defeat it. However, that initiative, unlike the 1998 tax levy, did not address the issue of *whether and at what level* fire protection and EMS, matters germane to the functioning of a municipality, would be funded; rather, the issue facing the voters was *how those services would be provided*, to wit: through membership in the joint fire district that had existed for 50 years, or otherwise. It was not germane to the purposes for which the City of Union exists to expend funds, which the taxpayers of that community had been compelled to pay through taxation, to finance the City's efforts to defeat an initiative proposal by some of those taxpayers, raising the issue of the entity by which those services would be provided the citizens of the community. Indeed, both Article II, § 1(F), of the Ohio Constitution and § 7.01 of the Union City Charter reserve the right of initiative to the people.

Moreover, this Court is also persuaded by the decision of the Tenth Circuit in *Campbell v. Joint District 28–J*, 704 F.2d 501 (10th Cir.1983). That litigation arose out of spending by a school district in Colorado, in opposition to the same citizen initiative as was at issue in *Mountain States*. The Tenth Circuit affirmed the decision of the District Court, ordering the members of the board of education for that school district to reimburse approximately $2,000.00 of taxpayers' funds which they had authorized to oppose that initiative.

The Tenth Circuit based its decision solely upon state law, which limited the expenditure of public funds by school districts in connection with electoral campaigns to matters of "official concern," concluding that spending to oppose a citizen initiative was not a matter of official concern for the school district, even though passage of the initiative would have severely limited its ability to increase taxes. Just as spending to oppose a citizen-sponsored initiative is not a matter of "official concern," expending funds to defeat the 1997 initiative was not germane to the purposes of the City of Union.

Accordingly, the Court concludes that the Defendants' expenditure of funds to oppose the 1997 initiative violated the principles of First Amendment jurisprudence established in *Abood*. However, as is explained above in footnote 7, before the Court can decide whether those actions violated the Plaintiffs' rights under the Free Speech Clause of the First Amendment, it must resolve an issue which the Defendants have not addressed, to wit: in accordance with *Keller, supra,* does the First Amendment limit the ability of a unit of government to expend taxpayers' money on political or ideological issues if such an expenditure is not germane. Since the Defendants did not raise the issue, the Plaintiffs have not had the opportunity to brief same. Therefore, the Court will not resolve it herein. Rather, the Court directs the parties to file simultaneous, cross motions for summary judgment on that issue, within 30 days from date. The parties may thereafter brief the issue in accordance with Local Rule 7.2(a)(2).

■ In addition, the Defendants argue that Applegate is entitled to summary judgment on the basis of qualified immunity.[10] In *Estate of Dietrich v. Burrows*, 167 F.3d 1007 (6th Cir.1999), the Sixth Circuit

---

**10.** Although this argument is also directed at the Plaintiffs' claim arising out of the financial support for the 1998 tax levy, the Court need not address that argument, since it has

concluded that both Defendants, Applegate and the City of Union, are entitled to summary judgment on the merits of that claim.

recently restated the principles that courts employ to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity:

As a general principle, "government officials performing discretionary functions enjoy qualified immunity from liability for performance of their official duties." [*Thomas v. Whalen*, 51 F.3d 1285, 1289 (6th Cir.1995)]. Whether such an official may nevertheless be held personally liable for an allegedly unlawful action involves an inquiry into the "objective legal reasonableness" of the action. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). If the constitutional right "the government official allegedly violated was clearly established at the time of the challenged conduct, 'the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.'" *Thomas*, 51 F.3d at 1289 (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. 2727).

When determining whether a right is "clearly established," we look "first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As the Supreme Court explained, however, "[t]his is not to say that an official action

is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted).

Herein, neither the Supreme Court, nor any Circuit Court, or any court within this Circuit had decided, prior to the fall of 1997, when the Defendants expended funds to oppose the citizen initiative, that a unit of government violates the First Amendment rights of taxpayers by so spending the tax dollars that they were compelled to pay to that governmental entity.[11] On the contrary, *Mountain States* was the only decision by any federal court that so held. In accordance with the standards set forth by the Sixth Circuit in *Estate of Dietrich*, one decision by the United States District Court for the District of Colorado does not clearly establish a right or a legal principle. Accordingly, this Court concludes that Applegate is entitled to summary judgment on the Plaintiffs' request for an award of damages,[12] from him in his individual capacity, arising out of his participation in the expenditure of funds to oppose the 1997 initiative.[13]

In sum, the Court has sustained in part and overruled in part the Defendants' Motion for Summary Judgment (Doc. # 29). The Court has sustained that motion to the extent that Defendants' seek summary judgment on the Plaintiffs' claim that the expenditure of public funds, during the 1998 tax levy, violated the Plaintiffs' rights under the Free Speech Clause of the First Amendment rights. In addition, the Court has sustained that motion to the extent that Applegate seeks summary judgment,

11. It bears emphasis that the Tenth Circuit's decision in *Campbell v. Joint District 28–J* was based solely upon state law.

12. The Plaintiffs also seek injunctive relief. It is axiomatic that the doctrine of qualified immunity does not prevent a District Court from enjoining a public official. *Collyer v. Darling*, 98 F.3d 211, 222 (6th Cir.1996), *cert. denied*, 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997).

13. Since the Court has concluded that Applegate is entitled to summary judgment on the basis of qualified immunity, it is not necessary to address the Defendants' alternative argument that he is entitled to same, on the basis of absolute immunity, since he was merely carrying out the decision of the Union City Council to expend funds to oppose the 1997 initiative.

on the basis of qualified immunity, on the Plaintiffs' claim for an award of damages from him in his individual capacity, arising out of the expenditure of funds to oppose the 1997 initiative. Also, since the Court has concluded that the Defendants' expenditure of public funds to oppose the 1997 initiative violated the *Abood* standards, it has overruled the Defendants' motion, to the extent they seek summary judgment on Plaintiffs' claim arising out of that spending. The Court has, however, directed the parties to file supplemental, cross motions for summary judgment, addressing *Keller, supra.* Additionally, the Court has overruled the Plaintiffs' Motion for Partial Summary Judgment (Doc. # 42), to the extent that they seek summary judgment on their claims that the Defendants' violated their First Amendment rights by expending public funds during both elections (concluding that the expenditure of funds to support the 1998 tax levy did not violate *Abood* and, further, that the issue of whether the spending to oppose the 1997 initiative violated the First Amendment cannot be resolved until the parties have briefed the implications and applicability of *Keller, supra.*) Otherwise, the Court has not ruled upon that motion.[14]

As a result of the ruling herein, a number of issues remain in this litigation. The Court will briefly set forth procedures, which will help lead to the resolution of those issues.[15] With their Motion for Partial Summary Judgment (Doc. # 42), the Plaintiffs seek summary judgment on a claim that they have not set forth in their Complaint, to wit: that the Defendants have selectively enforced its sign ordinances to favor or to disfavor particular points of view. The addition of an unplead claim has caused the Defendants to file a Motion to Strike (Doc. # 45), which, in turn, resulted in the Plaintiffs filing a Motion for Leave to Amend (Doc. # 49). The Defendants have opposed that motion, arguing that the Plaintiffs do not have standing to bring such a claim and that, in any event, such a claim is without merit. *See* Doc. # 54. Without addressing either of the Defendants' arguments, the Court sustains the Plaintiffs' Motion for Leave to Amend (Doc. # 49) and overrules the Defendants' Motion to Strike (Doc. # 45). Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend is to be "freely given." *See also, Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Moreover, it is axiomatic that cases should be decided upon their merits; therefore, the Court deems it appropriate to address the Defendants' arguments in opposition to the Plaintiffs' selective enforcement claim in the context of a motion for summary judgment. The Plaintiffs are directed to file an amended complaint, raising this issue, within 10 days from date.

The Defendants have also argued that they should be permitted to conduct discovery on the Plaintiffs' newly added claim, if the Court should grant leave to amend to the Plaintiffs. That request is eminently reasonable. The Defendants shall have 60 days, from the date upon which the Plaintiffs file their amended complaint, in which to conduct such discovery. Within 20 days thereafter, the Defendants must file a supplemental memorandum in opposition to that portion of the Plaintiffs' Motion for Partial Summary Judgment which raises the soon-to-be newly added claim of selective enforcement. The Defendants may also move for summary judgment on that claim.[16] The par-

---

14. The Court has not ruled upon the Plaintiffs' request for summary judgment on their claim arising out of the Defendants' removal of signs from the lawn in front of the City Building, during the campaign over the 1997 initiative. In addition, the Court has not ruled upon the Plaintiffs' request for summary judgment on their soon-to-be newly added claim of selective enforcement, which is discussed below.

15. Above, the Court has directed the parties to file supplemental, cross motions for summary judgment, addressing *Keller, supra.*

16. The Defendants' Motion to Strike Affidavits (Doc. # 53) is also pending. With that mo-

ties may thereafter brief the issue in accordance with Local Rule 7.2(a)(2).

tion, the Defendants request that the Court strike the affidavits which the Plaintiffs attached to their reply memorandum in support of their Motion for Partial Summary Judgment. The Defendants argue that it is not proper to base a ruling upon evidence to which they have not had an opportunity to respond. Since the matters set forth in those affidavits relate to the Plaintiffs' claim of selective enforcement, and, further, given that the Defendants will have an additional opportunity to brief that claim, the Court overrules the Defendants' Motion to Strike Affidavits (Doc. # 53). Those affidavits will be considered by this Court in ruling upon the Plaintiffs' Motion for Partial Summary Judgment and the Defendants' anticipated Motion for Summary Judgment on this issue.