John P. Wheeler, Jr. Finney County Attorney 409 North Ninth Street Garden City, Kansas 67846
Dear Mr. Wheeler:
As Finney County Attorney, you ask several questions concerning the Finney County Economic Development Corporation (FEDC). First you ask whether the Kansas Open Meetings Act (KOMA) and the Kansas Open Records Act (KORA) apply to the FEDC.
According to the information that we have been provided, in 1988 the Finney County Commissioners passed a resolution to levy a .25 mill tangible property tax "to assist in providing for a countywide economic development program." In 1989, the FEDC was formed, primarily through the efforts of the City and County. It is a Section 501(c)(3) not-for-profit corporation with a general purpose to promote economic development in Finney County. We understand that essentially all of the funding for FEDC is provided from a portion of the county's mill levy and a budget line item from the City of Garden City.
According to the articles of incorporation, there are seven directors. The bylaws indicate that the membership consists of Finney County, Garden City, Garden City Community College (GCCC), Garden City Chamber of Commerce, and Start-Inc. (Start-Inc. is a not-for-profit corporation created by the City and County to advise on community block grants. It has no budget, and it is not controlled by the City or County.)
Directors of the FEDC are elected by designation of the members. The County appoints two directors. The City, GCCC, Start-Inc., and the Chamber of Commerce each appoint one member. Another member is chosen by majority vote of all members. In short, governmental entities (including GCCC) directly choose four of the seven members, and have a majority vote in choosing an additional member.
The KOMA sets forth a two part test for groups covered by it, both elements of which must be met. The KOMA applies to:
 "[A]ll legislative and administrative bodies and agencies of the state and political and taxing subdivisions thereof, including boards, commissions, authorities, councils, committees, subcommittees and other subordinate groups thereof, receiving or expending and supported in whole or in part by public funds. . . ."[1]
The KOMA's application appears to be narrower than application of the KORA. The KORA implies that, subject to certain exceptions, any entity which is appropriated public funds may be covered by KORA since the KORA defines a public agency as:
 "[T]he state or any political or taxing subdivision of the state or any office, officer, agency or instrumentality thereof, or any other entity receiving or expending and supported in whole or in part by the public funds appropriated by the state or by public funds of any political or taxing subdivision of the state."[2]
The KORA implies that mere receipt of public funds may be enough to trigger its application, whereas the KOMA's two part test seems to imply that the body must also exercise some kind of governmental authority for the KOMA to apply. Because the FEDC is 100% funded through public funds, we do not hesitate to conclude that the KORA applies to it. The more difficult question is whether the KOMA applies.
In a recent opinion we considered whether the Prairie Village Development Corporation (PVDC) was subject to the KOMA[3]. The PVDC had a board of seven members, three of which were City Council members. New board members, including the three City Council members, were selected by existing board members. The bylaws also provided that the number of board members could be increased to nine at any time. The PVDC did receive all of its funding from the City; in its first year it received $15,000, in the second year $2,000, and in the third year $4000. Indications were that amounts it received would remain at these lower levels.
In analyzing whether the KOMA applied to the PVDC, we looked to the leading, and very problematic, case of Memorial Hospital v. Knutson.[4]
In Knutson, the Court determined that the KOMA did not apply to a not-for-profit corporation which was originally organized by a county hospital board to run the hospital. Because the corporation was organized so that new board members were not appointed by the county hospital board, and because, in at least the Court's view, the corporation did not spend public funds, the Court held that the KOMA did not apply. Our understanding of Knutson was expressed in an Attorney General Opinion as follows:
"In essence, the Court held that the reorganization of the Association went far enough to separate it from the authority of the county and that the Association was not delegated legislative or administrative authority."[5]
Based on the information we have, we understand the FEDC to have much stronger ties to governmental entities than the PVDC. Unlike the PVDC, governmental entities control appointment of more than a majority of the directors. Except for the first year, PVDC received grants for only a few thousand dollars. We understand that Garden City has a line item appropriation in the amount of $35,000 annually to the FEDC. This is in addition to whatever amount comes from the County.
We have not been provided with information concerning what the FEDC does with this funding or what services it actually performs. If it is performing a governmental function, it would be more likely that the KOMA applies.[6] Because of the apparently large amount of money the FEDC receives, we assume it must be performing some significant function.
Based upon the information with which we have been provided, it appears that the FEDC is a public agency for purposes of both the KORA and the KOMA.
Your other concern is FEDC's expenditure of public funds to a committee formed to promote a November, 2000, ballot question of whether U.S.D. 457 should be authorized to issue general obligation bonds for the construction of a second high school in the district. Apparently, the FEDC's position is that a second high school would be good for economic development.
While the Kansas appellate courts have not directly addressed the issue of whether public funds can be used to promote a position during an election, there are a number of cases from other jurisdictions that conclude that a public entity cannot do so.[7] Several cases rest on the lack of statutory authority to use public funds in this manner;[8]
dicta in others indicate that such activity may have constitutional implications:[9]
 "Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office. (Citations omitted.) The selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process."[10]
In prior Attorney General Opinions, this office has concluded that use of public funds to advocate a position is prohibited.[11] In Attorney General Opinion No. 93-125, Attorney General Robert T. Stephan concluded that public funds may not be used to promote or advocate a city governing body's position on a matter that is before the electorate. General Stephan relied on cases from other jurisdictions that so concluded because the only Kansas appellate case that mentioned the issue did so as an aside.
In Kansas Electric Power Co. v. City of Eureka,[12] taxpayers had sued to contest the validity of a bond election under which the City proposed to issue general obligation bonds to construct a building and purchase machinery to generate electricity. Allegations were made that the governing body used city funds to promote the bond issue. The Kansas Supreme Court, stated, in dicta:
 "Touching first upon the activities of the mayor and city commissioners in the pre-election campaign, persons who happen to hold city offices in their private capacity as electors are as free as other people to advocate their opinions. But as public officials they should maintain a reasonable semblance of neutrality."[13]
Despite the judicial reluctance to countenance the use of public funds to advocate a position in an election, there are recent cases that move away from the bright line prohibition in situations involving municipalities that are unfettered by statutory concerns.[14] These cases focus on whether a municipality's use of public funds to promote its position in an election violates the First Amendment to the United States Constitution.
In Lash v. City of Union, Ohio,[15] taxpayers challenged the City's expenditure of funds to promote the City's position in two elections. The first election involved an unsuccessful taxpayer initiative that attempted to block the City's creation of a fire district. The second election sought to impose a tax levy to finance the new fire district. The taxpayers argued, on the authority of Abood v. Detroit Board ofEducation,[16] that their First Amendment rights had been violated by virtue of the City's expenditure of funds to defeat the initiative and to support the tax levy.
In Abood, the United States Supreme Court held that a state could not, consistent with the First Amendment, force public employees to finance the ideological activities of the union that represented them, if those ideological activities were not "germane" to the duties of the union as their collective bargaining representative. However, public employees can be compelled to support the ideological activities of their union if those activities are germane to the duties of the union as their collective bargaining representative. The taxpayers in the Lash case argued that a city violates the First Amendment whenever it expends taxpayer funds to support or oppose any political or ideological matter regardless whether the particular issue is germane to the purposes of the municipality. The Federal District Court rejected the taxpayers' argument that all governmental spending on political or ideological issues violates the First Amendment, but applied the Abood holding in determining whether the City acted appropriately in spending public funds to promote its positions in the two elections. The Court concluded that the City properly expended public funds to support the tax levy because it was "unquestionably germane to the role of the elected officials of the City:"
 "Placing of the May, 1998 tax levy on the ballot was unquestionably germane to the role of the elected officials of the City of Union, as was the use of public funds to support its passage. That levy was for the purpose of raising funds to pay for fire protection and EMS and, thus, to provide protection to the residents of that community. This Court can conceive of few matters more germane to the fundamental function of local government than providing for the safety and protection of its citizens. Therefore, the Court concludes that the expenditure of funds for this purpose, a portion of which the plaintiffs were compelled to contribute through taxation, did not violate the Free Speech Clause."[17]
The Court also relied on the rationale of Alabama Libertarian Party v.Birmingham,[18] which upheld a city's use of public funds to support the passage of a bond issue which raised funds for public libraries and increased the tax for enhanced 911 service. The Birmingham Court noted that because the cause was "consistent with the common need of its citizens" and did not "require the plaintiffs to be the courier for an ideological or political message," the funds could be expended:
 "This was not a case where municipal funds were used to support a particular candidate, doctrine or ideology. Rather, the City merely solicited its citizens to provide funds to supply perceived needs common to all. The City and its officials not only have the right, but the duty, to determine the needs of its citizens and to provide funds to service those needs. The funds must come from some source. The City officials are charged with the responsibility of providing those funds by some means. If they cannot directly tax through ordinance, they have the incidental right to solicit the votes of citizens to provide those means. The City officials had already taken, through passage of ordinances, public positions on the issues. The advertisements do no more than to publicize the positions they have previously taken."[19]
While the Lash Court approved the use of funds to support the tax levy, it did not approve the use of funds to defeat a citizen sponsored initiative that challenged the City's decision to create a fire district because the matter was not "germane" to the functioning of the municipality:
 "[The] citizen initiative arose out of the [Council's] decision to withdraw from the joint fire district. The Plaintiffs, disagreeing with that decision, managed to get the issue placed on the ballot. The City . . . the very entity of government that would have been affected by that initiative, expended public funds to defeat it. However, that initiative, unlike the 1998 tax levy, did not address the issue of whether and at what level fire protection and EMS, matters germane to the functioning of a municipality, would be funded; rather, the issue facing the voters was how those services would be provided, to wit: through membership in the joint fire district that had existed for 50 years, or otherwise. It was not germane to the purposes for which the City . . . exists to expend funds . . . to finance the City's efforts to defeat an initiative proposal by some of those taxpayers, raising the issue of the entity by which those services would be provided the citizens of the community."[20]
The Court also relied on the holding in Mountain States LegalFoundation v. Denver School District,[21] wherein the Federal District Court granted a preliminary injunction to prevent a school district from expending funds to defeat a citizen sponsored initiative to amend the Colorado Constitution.[22]
Finally, in Cook v. Baca,[23] the Court relied upon the Birmingham
case to reject taxpayers' claims that the First Amendment bars a mayor from placing a message in citizens' water utility bills supporting a tax increase to repair streets. The Court also found persuasive dicta in a recent United States Supreme Court case addressing the First Amendment implications of mandatory student activity fees:[24]
 "[I]t is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies."[25]
Because of the dearth of Kansas appellate court guidance, it is difficult to speculate whether courts, in the absence of statute, would follow a bright line rule prohibiting the use of public funds to advocate on a matter before the electorate or would follow the rationale of the more recent cases that focus on whether the matter before the electorate is "germane" to the "fundamental function" of the governmental entity at issue. Determining what is germane and whether the publically funded support forces the protesting taxpayers to be "couriers for an ideological or political message" will depend upon the facts and notions of what are "fundamental" functions of the governmental entity.
Tossed into the mix is the "public purpose doctrine" which gives great deference to governmental bodies in deciding how funds are spent.[26]
However, that discretion can be curtailed when the governing body's action is "clearly evasive or violative of a constitutional provision."[27]
Given the penalties for misuse of public funds,[28] the uncertainty with how Kansas courts would address the use of public funds to advocate a position in a matter before the electorate and the necessity of making factual determinations, we are unable to opine regarding the propriety of the FEDC's contribution to the advocacy group in question.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Mary Feighny Assistant Attorney General
 Steve Phillips Assistant Attorney General
CJS:JLM:MF:SP:jm
[1] K.S.A. 75-4318(a).
[2] K.S.A. 45-217(e)(1).
[3] Attorney General Opinion No. 99-64.
[4] 239 Kan. 663 (1986).
[5] Attorney General Opinion No. 99-64.
[6] See Attorney General Opinion No. 94-111.
[7] See Carter v. City of Las Cruces, 915 P.2d 336 (N.M. 1996) and cases cited therein. See also Contemplating the Dilemma of Government asSpeaker:Judicially Identified Limits on Government Speech in the Contextof Carter v. City of Las Cruces, 27 N.M. L. Rev. 517 (1997).
[8] Campbell v. Joint District 28-J, 704 F.2d 501 (10th Cir. 1983);Stanson v. Mott, 551 P.2d 1 (Ca. 1976); Burt v. Blumenauer, 699 P.2d 158
(Or. 1985); Anderson v. City of Boston, 380 N.E.2d 628 (Mass. 1978);Mountain States Legal Foundation v. Denver, 459 F. Supp. 357 (D.Colo. 1978); District of Columbia Common Cause v. District of Columbia,858 F.2d 1 (D.C. Cir. 1988); Stern v. Kramarsky, 375 N.Y.S.2d 235 (1975);Citizens to Protect Public Funds v. Board of Education, 98 A.2d 673
(N.J. 1953).
[9] Mountain States Legal Foundation v. Denver, 459 F. Supp. 357
(D.Colo. 1978); Putter v. Montpelier Public School System, 697 A.2d 354,358 (Vt. 1997); Carter v. City of Las Cruces, 915 P.2d 336 (N.M. 1996).
[10] Stanson v. Mott, 551 P.2d 1, 9 (Ca. 1976).
[11] Attorney General Opinions No. 97-18, 93-125, 93-33.
[12] 142 Kan. 117 (1935).
[13] 142 Kan. at 119.
[14] But see K.S.A. 25-4169a which restricts the use of public funds by certain municipalities.
[15] 104 F. Supp.2d 866 (S.D.Ohio 2000).
[16] 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).
[17] 104 F. Supp.2d at 874.
[18] 694 F. Supp. 814 (N.D.Ala. 1988).
[19] Id. at 817-18.
[20] 104 F. Supp.2d at 876 (emphasis added in original).
[21] 459 F. Supp. 357 (D.Colo. 1978).
[22] While the decision in Mountain States rested on a lack of statutory authority, there is considerable dicta indicating that use of public funds to defeat a citizen initiative to amend Colorado's Constitution would not only violate the 1st Amendment but Article IV, § 4 of the United States Constitution ("The United States shall guarantee to every State . . . a Republican Form of Government").
[23] 95 F. Supp.2d 1215 (D.N.M. 2000).
[24] Board of Regents of the Univ. of Wisconsin System v. Southworth,529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 265 (2000).
[25] 120 S.Ct. At 1353.
[26] Duckworth v. City of Kansas City, 243 Kan. 386 (1988); Ullrichv. Bd. of Thomas County Comm'r, 234 Kan. 782 (1984).
[27] 234 Kan. at 789.
[28] K.S.A. 21-3910 creates a felony offense for using public funds "in a manner not authorized by law." Conviction requires forfeiture of office.