RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0346p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RONALD KIDWELL; JULIE JOHNSON; and CHARLES
ARNETT,

                                   *Plaintiffs-Appellants,*

                    *v.*

CITY OF UNION; and JOHN APPLEGATE,
                                   *Defendants-Appellees.*

No. 04-4153

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 02-00365—Thomas M. Rose, District Judge.

Argued: October 27, 2005

Decided and Filed: September 8, 2006

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas W. Condit, Cincinnati, Ohio, for Appellants. Lynnette P. Ballato, SUBASHI, WILDERMUTH & BALLATO, Dayton, Ohio, for Appellees. **ON BRIEF:** Thomas W. Condit, Cincinnati, Ohio, for Appellants. Lynnette P. Ballato, Tabitha D. Justice, SUBASHI, WILDERMUTH & BALLATO, Dayton, Ohio, for Appellees.

GIBBONS, J., delivered the opinion of the court, in which GRIFFIN, J., joined. MARTIN, J. (pp. 6-14), delivered a separate dissenting opinion.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-appellants, taxpayers in the City of Union, Ohio, sued the city and John Applegate, the City Manager, under 42 U.S.C. § 1983. Among other arguments, Plaintiffs claim that the defendants violated the First and Fourteenth Amendments by advertising and otherwise advocating against a citizen-sponsored ballot initiative and in favor of a tax levy. The district court granted the defendants' motion to dismiss the claims with respect to all defendants on all issues except for the improper use of funds to combat the citizen initiative. The district court subsequently granted the defendants' motion for summary judgment on the final issue. Plaintiffs appeal.

1

I.

This case arises from a series of disputed ballot initiatives beginning in 1997 relating to the creation and funding of a fire department in the City of Union ("Union"). In 1997, Union's fire and emergency services (along with those of other neighboring communities) were provided by the neighboring township of Randolph. The combination of the restructuring of the townships and the perceived inadequacy in Union's emergency services led to changes in the fire department structure. The Union Council ("Council") initially negotiated for a shared fire department with another neighboring town but ultimately passed an emergency resolution establishing a town fire department. The new fire department became effective on January 1, 1998.

The resolution establishing a Union fire department was challenged by the plaintiffs via a ballot initiative requiring a referendum. The referendum was preceded by a lively campaign in which the plaintiffs organized a "Vote Yes" campaign to retain the extant fire districts. The Council supported the opposite position and used public funds to disseminate information supporting its position to citizens. The Union City Charter permits the Council to "authorize the expenditure of public funds to provide information to the members of the public in connection with elections on proposed tax levies and bond issues . . . and other issues affecting the Municipality and not involving the election of candidates for a public office . . . ." Union City Charter § 5.09. Plaintiffs, however, object to the hanging of "Vote No" banners, mailing of leaflets to residents, advertising in local newspapers, and using the town newsletter to support the Council's position.[1] The referendum occurred in November 1997, and the Council's decision was ratified. Voters funded the new fire department in a May 1998 referendum.

Plaintiffs allege that the city continued to disseminate information and advocate for causes over the next several years. The advocacy included the use of public funds in 2000 and 2001 to oppose ballot initiatives regarding land annexation and provision of water and sewage services to non-residents and to promote tax levies in anticipation of referenda in 2001. The record is silent on the extent of the advertising by the Union government during these later referenda.

In response to Union's actions during the fire department referendum, the plaintiffs and others sued Union and Applegate, its Manager. The district court dismissed the claim. *Lash v. City of Union*, 104 F. Supp. 2d 866 (S.D. Ohio 1999). After the district court issued its ruling, the parties settled the case without appeal. The settlement agreement released the defendants from some claims but preserved plaintiffs' right to seek declaratory and injunctive relief relative to the use of funds to advocate a position on the 1997 ballot initiative and the 1998 tax levy for the fire department and to bring new claims arising after May 1998. The instant lawsuit against Union, Applegate, the mayor, and the town council of Union followed. The district court dismissed the mayor and town council after finding that they qualified, respectively, for qualified and absolute immunity. The court then granted summary judgment for Union and Applegate, holding that the spending for viewpoint-based advertising for citizen initiatives and tax levies in this case did not violate the First or Fourteenth Amendment. Plaintiffs argue on appeal that the city's advocacy was unconstitutional.[2]

---

[1]Defendants contest the factual accuracy of some of the plaintiffs' allegations. For example, they say that the "Vote No" banner was bought by a political action committee and only *hung* by a city employee.

[2]Because we hold that defendants did not violate plaintiffs' constitutional rights, we need not consider the immunity issue. Further, plaintiffs have abandoned the state law claim for injunctive relief relating to the Manager's expenditure of funds without Council authorization.

II.

This case presents the rare instance when public citizens seek to limit the speech of a governmental entity rather than the reverse. The scenarios in which citizens may halt a government's speech are limited. "[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995). The government's power to fund its speech is similarly limited, however. In *NAACP v. Hunt*, 891 F.2d 1555 (11th Cir. 1990), the Eleventh Circuit identified three categories of government actions that courts have determined to be unconstitutional infringement of free speech: (1) abridgment of equality in the field of ideas by granting differential access to public fora based on viewpoint; (2) monopolization of the "marketplace of ideas"; and (3) compulsion of citizens "to support candidates, parties, ideologies, or causes that they are against." 891 F.2d at 1565-66 (internal citations and quotations omitted). Plaintiffs assert that Union's actions violated two of these categories by denying them access to a public forum (the town newsletter and town treasury) and compelling them to support causes to which they are adverse. Plaintiffs urge us to find that government speech relating to elections is a form of unconstitutional compelled speech by distinguishing between governing and campaigning.

Turning first to the issue of differential access to public fora, plaintiffs argue that Union unconstitutionally denied them access to two public fora – the town newsletter and the town treasury – to which others had been granted access. A government abridges "equality in the field of ideas" when it grants "the use of a [public] forum to people whose views it finds acceptable, but [denies its] use to those wishing to express less favored or more controversial views." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Plaintiffs assert that they were denied access to the town newsletter, but, as the district court noted, they provide no evidence that they asked for or were refused access to that forum, even if it was public. Plaintiffs have similarly failed to present evidence that any other private group was given access to the newsletter other than a single quote about the contested issue that was responsive to another quote advocating the contrary position. "[W]hen government property is not dedicated to open communication the government may–without further justification–restrict use to those who participate in the forum's official business." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 53 (1983). The single quotation cannot be construed as opening the newsletter as a public forum. *See Cook v. Baca*, 95 F. Supp. 2d 1215, 1221 (D.N.M. 2000) (noting that one factor in the determination of whether a public forum existed is the "extent of use of the forum"). Further, "when the government determines an overarching message and retains power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes." *ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 375 (6th Cir. 2006), citing *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 559-67 (2005). Here, Union approved the message delivered in the town newsletter, so its content must be considered that of the city itself, not that of the quoted private citizen. *See Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 686 (1992) (O'Connor, J., concurring) (agreeing that airport is not a public forum). Plaintiffs thus cannot prevail on their public forum claim relating to the newsletter.

The town treasury is not a public forum; it is not "by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46. Nor is the treasury a limited purpose public forum; Union has not opened that treasury to the public by making any town funds available to private individuals or groups. Union has used the treasury for its own speech – a use that has no effect on the treasury as a public forum. *Id.* ("As we have stated on several occasions, the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." (quotations and citations omitted)); *cf. Rosenberger* 515 U.S. at 833 (granting the government deference to use its funds to further its own viewpoint). To hold that Union's advocacy converts its treasury to a public forum would severely limit the town's ability to

self-regulate and would be tantamount to a heckler's veto, where the government could not speak for fear of opening its treasury to the public. This argument is therefore baseless, and the plaintiffs' public forum challenge cannot succeed.

As to the plaintiffs' second claim regarding compelled speech, governments cannot compel citizens to support positions with which they disagree. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) ("The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable."). This case, however, presents a compelled subsidy – not a compelled speech – claim because the plaintiffs were not themselves required to speak in any manner. While plaintiffs cast the compelled speech argument distinguishing governing and campaigning as separate from the compelled subsidy issue, we believe that it is more appropriate to describe the speech issue as a special case of the compelled subsidy issue, as dealt with in *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005).

The Supreme Court has held in several instances that compelled subsidies may violate the First Amendment rights of citizens. *See Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977) (labor union political action); *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) (bar dues for political action); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000) (student activities fund for extracurricular activity). All of the cases in which the Supreme Court has held a compelled subsidy to be a First Amendment violation have involved subsidies of speech by private organizations rather than by the government itself. Governmental subsidies are distinguishable from the labor union, state bar, and state university contexts because it is imperative that government be free to make unpopular decisions without opening the public fisc to opposing views. The Supreme Court recognized this distinction in *Southworth*: "The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to defend its own policies." 529 U.S. at 229. More recently, in *Johanns v. Livestock Mktg. Ass'n*, the Court addressed a compelled subsidy directly in the governmental context:

> Our compelled-subsidy cases have consistently respected the principle that "[c]ompelled support of a private association is fundamentally different from compelled support of government." "Compelled support of government" – even those programs of government one does not approve – is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position.

544 U.S. 550, 559 (2005) (quoting *Abood*, 431 U.S. at 259 n.13 (Powell, J., concurring in judgment)).

Here, the plaintiffs have challenged the expenditure of tax dollars by a governmental entity to advocate a position – a case that the Supreme Court deemed "perfectly constitutional" in *Johanns. Id.* at 2062. Though the plaintiffs acknowledge that the speech in this case is attributable to the government, they argue that the power of the government to compel subsidies for its speech is not as broad as the Supreme Court suggested in *Johanns*. Because the asserted subsidy arose in the context of an election, the plaintiffs argue that this court should find Union's speech to be unconstitutionally compulsive.[3]

---

[3] Neither the plaintiffs nor the dissent have identified a single case where a court relied upon such a distinction to decide a free speech question. Several cases discussed in the dissenting opinion, notably *Dist. of Columbia Common Cause v. Dist. of Columbia*, 858 F.2d 1 (D.C. Cir. 1988), *Stanson v. Mott*, 551 P.2d 1 (Cal. 1972), *Citizens to Protect Public Funds v. Bd. of Educ.*, 98 A.2d 673 (N.J. 1953), and *Mountain States Legal Found. v. Denver Sch. Dist. No. 1*, 459 F. Supp. 357 (D. Colo. 1978), were decided on statutory or other non-constitutional grounds, so they lack direct applicability here. Moreover, they were all decided before *Southworth*, *Rosenberger*, and *Johanns* clarified the extent

As the dissent recognizes, elections raise unique constitutional issues because they are the very foundation of a democratic system: where the government uses its official voice in an attempt to affect the identity of the people's elected representatives, it can undermine its legitimacy as a champion of the people's will and thereby subvert one of the principles underlying democratic society. *See Stanson v. Mott*, 551 P.2d 1, 9 (Cal. 1976) (discussing importance of elections in the democratic process). Although these principles require some limit on the government's power to advocate during elections, they do not support a bright line rule barring such speech, at least where the government speaks within the scope of its governance functions.[4] Governments must serve their citizens in myriad ways, including by provision of emergency services, and these activities require funding through taxation. Union's speech related to emergency service and tax initiatives thus fits squarely within its competence as governor and was made in the context of "advocat[ing] and defend[ing] its own policies." *Southworth*, 529 U.S. at 229. The issues on which the city advocated were thus germane to the mechanics of its function, and are clearly distinguishable from the hypothetical cases of government speech in support of particular candidates suggested by the dissent. *See Rosenberger,* 515 U.S. at 833; *Southworth*, 529 U.S. at 229. Where speech is not so directed, the result may be different: in *Mountain States Legal Foundation v. Denver School District #1*, by contrast, the court ruled illegal a *local* school board's use of public funds for advocacy in a *statewide* initiative regarding education funding. 459 F. Supp. 357, 361 (D. Colo. 1978). Unlike Union's actions, the school board's advocacy in *Mountain States* was not directly related to its governance functions and was struck down.

In this case, Ohio's home rule system made Union's policies subject to acceptance or rejection by ballot. In this context, a limit on government speech during elections would allow hecklers to silence the government on issues in which it has an interest and expertise – and on which citizens have an interest in hearing their government's perspective. *See Ala. Libertarian Party v. City of Birmingham*, 694 F. Supp. 814, 817 (N.D. Ala. 1988) (upholding promotional campaign relating to levies where the subject of the campaign was "related to the common needs of all citizens"). Because Union's speech in this case was germane to its role as governor, plaintiffs have failed to show that democratic legitimacy is threatened or that Union's compelled subsidy of its speech violates the Constitution.

The natural outcome of government speech is that some constituents will be displeased by the stance their government has taken. Displeasure does not necessarily equal unconstitutional compulsion, however, and in most cases the electoral process – not First Amendment litigation – is the appropriate recourse for such displeasure. *See Johanns*, 544 U.S. at 563 (noting the importance of political accountability of decisionmakers). The needs of effective governance command that the bar limiting government speech be high. The plaintiffs in this case have failed to show that the City of Union's expenditures crossed the line separating a valid compelled subsidy from an unconstitutional one, and valid advocacy from prescription of orthodoxy.

For the foregoing reasons, we affirm the district court decision.

---

to which governments do have the right to support their own positions on contested issues. As a result, a close analysis of these cases is of limited value in this case.

[4]The dissent conclusorily rejects any distinction between permissible government speech reasonably related to governance functions and impermissible speech, for example, speech in support of a particular candidate for office. Common sense militates and Supreme Court precedent requires us to reject the dissent's position. The dissent wrongly ignores not only the Supreme Court's recent strengthening of its compelled subsidy jurisprudence in *Johanns*, but also *Southworth's* and *Rosenberger's* more generalized holdings as to a government's right to defend its own policies. A bright line rule against any governmental speech regarding any referendum would violate these clear dictates favoring a more nuanced test for the propriety of such speech.

———————————

**DISSENT**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure." *Boyd v. United States*, 116 U.S. 616, 635 (1886). So it is in this case. Here, we confront state action that is at the same time innocuous yet threatening to our republican form of government. Although local governmental expenditures to advocate in an election may seem commonplace and uninspiring, I take the position that governmental campaigning in elections is implicitly prohibited by our constitutional design and republican form of government. "Free and honest elections are the very foundation of our republican form of government," *MacDougall v. Green*, 335 U.S. 281, 288 (1948) (Douglas, J., dissenting), and when the government uses tax dollars to enter an electoral contest and advocate in favor of a position or candidate, it distorts the very check on governmental power so central to our constitutional design — the next election — that I must conclude such activity is unconstitutional.

There are, of course, broad competing principles on both sides of the issue. On the side of the government, it can be argued that government must be permitted to speak or it will cease to be effective as a government. *ACLU v. Bredesen*, 441 F.3d 370, 381 (6th Cir. 2006) (Martin, J., concurring in part and dissenting in part) ("[T]he government may generally speak and control its own message."). On the other hand, as Thomas Jefferson wrote in 1801, "it is expected that [a government official] will not attempt to influence the votes of others nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it." 1 James D. Richardson, A Compilation of the Messages and Papers of the Presidents, 1789-1897, at 98-99 (1899).

The government speech doctrine, while in the early stages of development, provides support for the proposition that government must be able to speak to function. Government must be able to adopt policies and advocate for and defend against those policies.[1] If private speech were the only permissible speech regarding governing, the role of government would drastically change and the idea that governmental policies reflect and are representative of the majority would be lost. This indicates that the government must, of course, be permitted to speak in order to govern and educate.

The taxpayers here have conceded the existence of the government speech doctrine as a general matter, but draw a distinction between government speech related to *governing* and speech intended to *campaign* or to influence an election. I think they make a good point. There are several cases both at the state and federal district court level reviewing the propriety of governmental expenditures designed to influence local elections. It is worthwhile to review these cases.

Most often these cases arise in the context of municipal bond initiatives where the local government uses taxpayer funds to campaign in favor of the proposal. A prominent case from the Supreme Court of California is *Stanson v. Mott*, 551 P.2d 1 (Cal. 1976). *Stanson* involved a taxpayer's complaint that the California Department of Parks and Recreation had authorized the expenditure of more than $5,000 of public funds to promote the passage of the bond issue placed

———————————

[1] Of course, a necessary corollary to the doctrine of government speech is governmental accountability for that speech. "Otherwise there is no check whatever on government's power . . ." *Johanns*, 125 S. Ct. at 2068 (Souter, J., dissenting). Thus, the government, when it speaks, ought to be required to make clear that it is in fact the government that is speaking. Government speech ought to be labeled as such to prevent confusion and subliminal governmental propaganda in the marketplace of ideas.

on the ballot by the state legislature. *Id.* at 3. The court held that "at least in the absence of clear and explicit legislature authorization, a public agency may not expend public funds to promote a partisan position in an election campaign; in the present case, no legislative provision accorded the Department of Parks and Recreation such authorization." *Id.* The court did find legislative authority to "disseminate 'information' to the public relating to the bond election" but the department "in fulfilling this informational role, was obligated to provide a fair presentation of the relevant facts." *Id.* The promotional materials disseminated by the department in *Stanson* were similar to those complained about in the instant case. *See id.* at 4.

The Supreme Court of California found that the department lacked the express legislative authority for the expenditure of funds designed to influence the bond proposal. That court cited with approval to, *Citizens to Protect Pub. Funds v. Board of Educ.*, 98 A.2d 673 (N.J. 1953), an opinion written by then New Jersey Supreme Court Justice and future United States Supreme Court Justice William Brennan, discussing the legality of a school board's expenditure of public funds on a booklet concerning a school building program which was to be the subject of an upcoming bond election. *See Stanson*, 551 P.2d at 8. The booklet in New Jersey exhorted "Vote Yes" on several pages and warned of consequences "if You Don't Vote Yes." *Id.* The New Jersey Supreme Court, through Justice Brennan concluded that

> the board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and this imperilled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint. The expenditure then is not within the implied power and is not lawful in the absence of express authority from the legislature.

*Citizens to Protect Pub. Funds*, 98 A.2d at 677.

In *Stanson*, the Supreme Court of California further remarked that "[i]ndeed, every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized or on the broader ground that such expenditures are never appropriate." *Stanson*, 551 P.2d at 8-9 (citations omitted). Commenting further, the court noted that

> [u]nderlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests on an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office; the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process.

*Id.* at 9 (citations omitted).[2]

---

[2] The court also commented on "[t]he importance of government impartiality in electoral matters," and observed that in another recent case it had stated that "[a] fundamental goal of a democratic society is to attain the free and pure expression of the voters' choice of candidates" and that "our state and federal Constitutions mandate that the government

Notwithstanding its comments regarding the constitutional scope of the wrong, the court explicitly denied resolving the federal constitutional question. According to the court, "we need not resolve the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning, because the legislative provisions relied upon by [the department] certainly do not authorize such expenditures." *Id.* at 10.

Two additional features of the decision are relevant to my analysis of the issue. First, the Supreme Court of California refused to draw a distinction between public funds to support a particular candidate and public funds to promote a ballot measure. *Id.* at 9. According to the court, "past authorities have not drawn such a distinction between 'ballot measure' and 'candidate' campaigning; to date the judicial decisions have uniformly held that the use of public funds for campaign expenses is as improper in bond issue or other noncandidate elections as in candidate elections." *Id.* Second, the court noted that reasonable expenditures for *informational* purposes pose no problem, while exhortational campaign expenditures are improper. The court did concede that "[p]roblems may arise, of course, in attempting to distinguish improper 'campaign' expenditures from proper 'informational' activities." *Id.* at 11. The court instructed that "no hard and fast rule governs every case" and that "a careful consideration of such factors as the style, tenor and timing of the publication" are necessary to resolve the difficult question. *Id.* at 12.

The *Stanson* case is informative, but of course, not controlling. Additionally, although it discussed the constitutional question and expressed its concerns, the court explicitly declined to rule on it. Instead, the court's invalidation of the expenditures was based on legislative enactment (or an absence thereof) and not on the First Amendment. Moreover, in discussing the constitutional question, the court did not explicitly ground its concerns in any particular provision of the United States Constitution. Rather, as discussed above, the court stated that the expenditures "raise potentially serious constitutional questions." *Id.* at 9. These questions, it appears, relate to a "fundamental precept of this nation's democratic electoral process," to concerns over the use of governmental authority to "improperly perpetuate themselves," and finally, to concerns over the "improper distortion of the democratic electoral process." The concerns explicitly relate to the *electoral* process and make no mention of government speech in the general process of governing. Moreover, it appears that the court's expressed constitutional concerns stemmed from the structure and purpose of the Constitution and not necessarily the First Amendment (as alleged in the instant case). Finally, the court did note that (to that date) every court that had reviewed such election or campaign expenditures had found them improper, though all on statutory, and not constitutional grounds.

Another case decided several years after the *Stanson* decision is *District of Columbia Common Cause v. District of Columbia*, where the D.C. Circuit held that expenditures made by the city government in a campaign to defeat a ballot proposal were illegal. 858 F.2d 1 (D.C. Cir. 1988) ("We hold that the individual appellees have standing as municipal taxpayers to challenge expenditures by the District of Columbia government to *influence* the outcome of an initiative. On the merits, we conclude that the expenditures were illegal."). The district court found that the expenditures violated both statutory law as well as the federal constitution, ruling that the promotion of only one side of a contested election issue amounted to a content-based government subsidy. The D.C. Circuit affirmed on statutory grounds but explicitly declined to address the argument that the expenditures violated the First Amendment. *Id.* at 11.

Another case invalidating expenditures on statutory grounds is *Mountain States Legal Foundation v. Denver School District # 1*, 459 F. Supp. 357 (D. Colo. 1978). *Mountain States Legal*

---

must, if possible, avoid any feature that might adulterate or, indeed, frustrate, that free and pure choice." *Stanson*, 551 P.2d at 10 (citations omitted).

*Foundation* involved a voter proposed petition to amend the Colorado Constitution "in a manner which would affect the authority of all levels of representative government in Colorado to spend public funds." *Id.* at 358. The Board of Education of School District No. 1 adopted a Resolution declaring its opposition to the proposed state constitutional amendment and urging that it be defeated. The Resolution also authorized the use of school district "equipment, materials, supplies, facilities, funds and employees necessary to (1) Distribute campaign literature to School District employees, and the parents of children in the schools. (2) The use of telephones and facilities of the School District during non-working hours by volunteers for the purpose of contacting the public to urge the defeat of this amendment." *Id.*

The district court in *Mountain States* favorably cited to both *Stanson* and *Citizens to Protect Public Funds* and found that the school district had exceeded its legislatively granted authority under state law. *Id.* at 359-60. The court further commented on the constitutional question, though it was not key to the resolution of the case. The court remarked that an interpretation of Colorado's state Campaign Reform Act allowing this type of "partisan use of public funds . . . would violate the First Amendment to the United States Constitution." *Id.* at 360. According to the court, "[i]t is the duty of this Court to protect the political freedom of the people of Colorado. The freedom of speech and the right of the people to petition the government for a redress of grievances are fundamental components of guaranteed liberty in the United States." *Id.* (citation omitted). Thus, the court appears to have based its ruling on both the First Amendment's freedom of speech clause as well as the right to petition the government for a redress of grievances — an apparent link to the fact that the election was over a voter initiated proposed constitutional amendment to alter the structure and powers of government.

The court further stated that "[a] use of the power of publicly owned resources to propagandize against a proposal made and supported by a significant number of those who were taxed to pay for such resources is an abridgment of those fundamental freedoms." *Id.* Expressing concern that governmental opposition to a proposed constitutional amendment would have "the effect of shifting the ultimate source of power away from the people," the court concluded that "[p]ublicly financed opposition to the exercise of that right contravenes the meaning of both the First Amendment to the United States Constitution and Article V, Section 1 of the Constitution of Colorado." *Id.* at 361. Adding an additional basis, the court stated that "the expenditure of public funds in opposition [to a citizen led effort] violates a basic precept of this nation's democratic process. Indeed, it would seem so contrary to the root philosophy of a republican form of government as might cause this Court to resort to the guaranty clause in Article IV, Section 4 of the United States Constitution." *Id.*

In sum, the *Mountain States* court appears to have held that the expenditure of public funds violated state statutes, the state constitution, and the federal constitution. In reaching that conclusion with respect to the federal constitution, however, while the court mentioned the First Amendment, it devoted little explanation as to why citizens's free speech rights are violated in this situation. Instead, the court focused more on basic democratic principles, fundamental freedoms, and guaranteed liberties, and it did so emphatically with reference to the fact that this involved a voter initiated *constitutional* amendment and the government acted in *opposition* to it. In doing so, the court appears to have concluded that public expenditures on campaigns in this situation undermines the validity of elections and the constitutional amendment process and shifts the balance of power away from the citizens. The court's opinion demonstrates that grounding this principle in a specific constitutional provision (as opposed to the structure and democratic purpose of the constitution) proves somewhat difficult.

While the taxpayers rely on *Mountain States Legal Foundation*, the City relies on *Alabama Libertarian Party v. City of Birmingham*, 694 F. Supp. 814 (N.D. Ala. 1988). Like this Court is asked to do in the instant case, the district court in *Alabama Libertarian Party* considered only the

federal constitutional question and did not consider any claims arising under state law.  There were two elections at issue in *Alabama Libertarian Party*.  The first was an election regarding a city-proposed property tax increase for library enhancements and a levy on telephone subscribers for enhanced 911 emergency services.  *Id.* at 815.  Prior to the election, "the City launched a promotional campaign to encourage passage of the propositions."  *Id.*  The campaign included newspaper and radio advertisements.  *Id.*  The second was another special election held a year later over a proposed bond issue and this time the City distributed leaflets and brochures in favor of the bond issue.  *Id.*  The taxpayer plaintiffs claimed that the campaigning violated their First Amendment rights.

The district court in *Alabama Libertarian Party* began by reviewing the Supreme Court's decision, *Abood v. Detroit Board of Educ.*, 431 U.S. 209 (1977).  In *Abood*, the Court considered whether organizations to which dues must be paid as a mandatory condition of state employment may use those dues to advance political causes not supported by all of the members.  The Court held that the exactions violated the First Amendment by allowing the funds to be used for political and ideological purposes — that is, the First Amendment generally prohibits compelled subsidies for political purposes.  *Id.*

After considering *Abood*, the district court concluded that the "critical" issue is "whether a portion of plaintiffs' tax funds were expended for 'political' and 'ideological' purposes."  *Alabama Libertarian Party*, 694 F. Supp. at 817.  The district court then concluded that the campaigns waged by the City and the funds spent were not on "political" or "ideological" causes, but rather were "related to the common needs of all citizens."  *Id.* ("The court does not believe that the City's advertising campaign was political or ideological in nature.").  Rejecting the taxpayers' constitutional claims, the district court found that "the City leadership has determined to promote a cause consistent with the common needs of its citizens.  It is not requiring plaintiffs to be the courier for an ideological or political message."  *Id.*  The court appears to have drawn a distinction between situations where funds are "used to support a particular candidate, doctrine or ideology" and the case before it where "the City merely solicited its citizens to provide funds to supply the perceived needs common to all."  *Id.*  In the latter situation, the court reasoned, the "City and its officials not only have the right, but the duty, to determine the needs of its citizens and to provide funds to service those needs."  *Id.*

The court also noted that the City had already passed ordinances in favor of the levies and therefore had already taken public positions on the issues — thus, spending funds to advertise was no more than publicizing the positions already taken.  *Id.* at 818.  Drawing distinctions between past cases, the district court noted that in *Common Cause* and *Mountain States Legal Foundation*, the issue confronted was a citizens's initiative election while in Alabama, the election was over the City's own initiative.  *Id.* at 819.  Thus, the district court stated that "[w]hile this court may not agree that a governmental entity can never take sides in an initiative election, it certainly cannot agree that a governmental entity cannot expend funds to even publicly endorse its own measures."  *Id.*  The court found further support from its ruling through the political process, noting that citizens who disapprove of the governmental election campaigning may dissent at the polls.  *Id.* at 820.  Moreover, the court also suggested that not permitting the government to advocate "would be violative of their own First Amendment rights."  *Id.*[3]  Finally, the court concluded that

> It would be a strange system indeed which would allow the City to determine its
> needs, allow it to adopt ordinances calling for elections to fulfill those needs, allow
> it to bear the expense of those elections, and then require it to stand silently by before

---

[3] Presumably the district court was discussing the First Amendment rights of the individual city officials rather than asserting that the First Amendment guarantees the government the freedom of speech — which it does not.

the issues are voted on. Obviously, the City is not neutral under such circumstances and should not be required to appear so.

*Id.* at 821.

The district court's opinion in *Alabama Libertarian Party* is interesting for several reasons in addition to the fact that it is the only opinion to address solely the First Amendment and no questions of state law. The first point of note is the district court's conclusion that the "critical" issue is whether the funds spent are used for "political" or "ideological" purposes. More curious is the district court's conclusion that the governmental advertising campaign exhorting the citizens to "VOTE YES!" was neither political nor ideological, but rather "related to the common needs of all citizens." I do not endorse a distinction between electioneering expenditures for the common needs of citizens versus expenditures for political purposes. To determine that something is in the common needs of citizens is itself a *political* decision. Thus, I do not think that a principled basis for such a distinction exists, and I do not find this approach to be useful in this context.

Second, the *Alabama Libertarian Party* court, like the district court in *Mountain States Legal Foundation*, emphasized the fact that the Alabama election was for tax levies and not a constitutional amendment. The district court, however, did not explain why a different result is compelled by this distinction. And third, the district court drew another distinction between governmental *opposition* to a citizen sponsored initiative and governmental *promotion* of proposed issues. Stated another way, the court appeared to find it more constitutionally troubling for the government to say "Vote No," than for it to say "Vote Yes."

In *Cook v. Baca*, 95 F. Supp. 2d 1215 (D.N.M. 2000), a New Mexico district court confronted the First Amendment constitutional issue posed by these cases and sided with the district court in *Alabama Libertarian Party*. At the outset, the court noted that "[a]t some threshold level, a public entity must refrain from spending public funds to promote a partisan position during an election campaign." *Id.* at 1227 (quoting *Carter v. City of Las Cruces*, 915 P.2d 336 (N.M. Ct. App. 1996)). The court was also "[m]indful that unconstitutional practices may be their 'first footing' in the 'mildest and least repulsive form.'" *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)). Nevertheless, the court found "no ominous threat to the First Amendment in Defendants' minimal actions," and rejected the taxpayers's claim. In doing so, the district court, like the court in *Alabama Libertarian Party* drew a distinction between opposition to a citizen proposed state constitutional amendment and the expenditure of funds "to promote a tax initiative which was proposed by the mayor himself." *Id.* at 1227 n.18 (emphasis deleted). The district court concluded by mentioning the Supreme Court's decision in *Board of Regents of the Univ. of Wisconsin System v. Southworth*, 529 U.S. 217 (2000). There the Court stated that

> It is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens. The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies.

*Id.* at 229. The district court, however, did not necessarily address any differences, should they exist, between ordinary advocacy and defense of valid governmental programs and attempts to influence elections.

To recap, courts have been hostile toward the type of electioneering expenditures at issue in this case. *See e.g.*, *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1 (D.C.

Cir. 1988) (affirming district court's decision holding expenditures improper on statutory grounds, but not reaching constitutional question); *Cook*, 95 F. Supp. 2d at 1227 ("At some threshold level, a public entity must refrain from spending public funds to promote a partisan position during an election campaign."); *Mountain States Legal Foundation*, 459 F. Supp. at 360 ("[T]he expenditure of public funds in opposition [to a citizen led constitutional amendment] violates a basic precept of this nation's democratic process.  Indeed, it would seem so contrary to the root philosophy of a republican form of government . . ."); *Stanson*, 551 P.2d at 9 ("A fundamental precept of this nation's democratic electoral process is that the government may not 'take sides' in election contests or bestow an unfair advantage on one of several competing factions.").  The vast majority of courts that have issued injunctions against governmental campaign expenditures have done so based, for the most part, on state law.[4]  The courts finding governmental campaign expenditures to be unlawful based on state or local law have, in dicta, found additional support in various parts of the Constitution — the First Amendment, the general purpose and structure of the Constitution, the Guaranty Clause, and "democratic principles."  On the other hand, the courts finding no constitutional problem with the expenditures have done so on various and inconsistent bases.  Some courts have utilized traditional forum analysis in the context of viewpoint discrimination.  Other courts have simply held that government has a right to speak at all times and need not remain neutral in the context of an election.  The district court in this case applied a case involving a state's decision to fly the Confederate flag over the state house — basically an application of forum analysis and consideration of viewpoint discrimination.

I agree with the courts who have opined that electioneering expenditures raise serious constitutional concerns.  I concede that the government may ordinarily speak to advocate and defend its own policies.  The caveat, however, is always that the citizens' remedy is at the ballot box in the next election.  In these cases, however, the government is distorting the *only* check on its power. I am not sure I would limit this argument to the confines of the First Amendment; rather, to me, it is more of a structural argument regarding democratic principles and the structure and purpose of the constitution.  In *Burt v. Blumenauer*, the Oregon Supreme Court persuasively wrote that: "It hardly seems necessary to rely on the First Amendment, at least when government resources are devoted to promoting one side in an election on which the legitimacy of the government itself rests. The principles of representative government enshrined in our constitutions would limit government intervention on behalf of its own candidates or against their opponents even if the First Amendment and its state equivalents had never been adopted."  699 P.2d 168, 175 (Or. 1985).

The courts that have reviewed these questions have almost universally relied upon state or local law to invalidate them.  In dicta, however, many courts have gone on to speculate as to the constitutional question.  These courts have referenced the Framers' concerns with governmental campaigning and the expenditure of funds in that context, specifically citing the Framers' concern

---

[4]As discussed earlier, the plaintiffs's state law claim was dismissed by the district court for a failure to exhaust state remedies and the plaintiffs did not appeal this decision. We therefore have before us only a First Amendment claim. We do not know the status of any state proceedings or if they exist, but I take note of a provision of the Union Charter that states:

> Section 5.09. Public Information on Issues.  The council shall have the power to appropriate and authorize the expenditure of public funds to provide information to the members of the public in connection with elections on proposed tax levies and bond issues for the purposes of the Municipality, and other issues affecting the Municipality and not involving the election of candidates for a public office, or the recall of a member of the Council.

Why the plaintiffs have not more vigorously pursued their claim under state law, or why they have not argued for pendant jurisdiction, we can only speculate. Thus, the majority's decision that these specific expenditures do not run afoul of the First Amendment might prove irrelevant if Section 5.09 is interpreted to permit, as *Stanson* did, expenditures to *inform*, but not to *persuade*.

with attempts to perpetuate a government in office. In this case, we are faced with tax levies and fire departments. One might claim that, as at least one court did, these are issues for the common good and therefore are of little constitutional concern. Continuing down this path, one might ask whether the government could campaign and expend funds promoting a city council resolution extending the term lengths of current office holders, say for one year, for ten years, or even for life. This idea, and the idea that governmental funds could be spent in an effort to perpetuate a government in office is no doubt antithetical to the values underlying the Constitution.

There is no constitutional provision, however, that says governments may not make attempts to perpetuate themselves or spend funds pursuant thereto. And, there is no principled way, as I see it, to distinguish between the fire department election and any other — if one is unconstitutional, the others must be as well. Another example from recent history (setting aside state laws that may prevent the practice) — could former California Governor Gray Davis have expended governmental funds to campaign, advertise, and electioneer against his recall? Yet again another scenario that appears antithetical to democratic principles. Furthermore, there appears to be nothing in the First Amendment or any other constitutional provision that would prevent the government from spending taxpayer funds or actively campaigning in support of a *particular candidate*. It would tear at the fabric of democracy to permit as much despite the absence of a specific constitutional provision to defeat this type of governmental abuse, and I see no relevant distinction between that abuse and the one before this Court today.

I believe that the Constitution properly prohibits the government from having a horse in the race when it comes to elections. When government advocates on one side of an issue, the ultimate source of governing power is shifted away from the people and the threat of official doctrine exists. Of course, the threat is not as omnipresent today in the United States as it is in some other countries. There is no real evidence in any of these cases on point that the government as speaker crowded out private speech. There is no evidence that the government sought to suppress or in any way discourage other speech of a contrary nature. The absence of this evidence, however, does not in my opinion cure the underlying evil — that is, ordinary democratic controls are insufficient as a remedy in situations where governmental influence threatens to undermine the independent political process.[5] Governmental advocacy and campaign expenditures could arguably threaten to undermine

---

[5]Perhaps it is time for the Supreme Court to reconsider its Guarantee Clause jurisprudence. The Guarantee Clause, found in Article IV, Section 4 of the Constitution states: "The United States shall guarantee to every State in this Union, a Republican Form of Government, and shall protect each of them against Invasion and on Application of the Legislature or of the Executive (when the Legislature cannot be convened) against domestic Violence." When a claim is alleged under the Guarantee Clause, the Supreme Court has dismissed it stating some version of the following: "As to the guaranty to every state of a republican form of government, it is well settled that the questions arising under [this clause] are political, not judicial, in character, and thus for the consideration of the Congress and not the courts." *Ohio ex rel. Bryant v. Akron Metro. Park Dist.*, 281 U.S. 74, 79- 80 (1930) (citations omitted). Prominent scholars have suggested that the Court reconsider this approach. *See* Erwin Chemerinsky, *Cases Under The Guarantee Clause Should Be Justiciable*, 65 U. Colo. L. Rev. 849 (1994). Additionally, in *New York v. United States*, 505 U.S. 144, 184 (1984), Justice O'Connor, writing for the majority, stated that: "The view that the Guarantee Clause implicates only nonjusticiable political questions has its origin in *Luther v. Borden*, 7 How. 1, 12 L.Ed. 581 (1849), in which the Court was asked to decide, in the wake of Dorr's Rebellion, which of two rival governments was the legitimate government of Rhode Island. The Court held that 'it rests with Congress,' not the judiciary, 'to decide what government is the established one in a State.' *Id.*, at 42. Over the following century, this limited holding metamorphosed into the sweeping assertion that '[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts.' *Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946) (plurality opinion). This view has not always been accepted. In a group of cases decided before the holding of *Luther* was elevated into a general rule of nonjusticiability, the Court addressed the merits of claims founded on the Guarantee Clause without any suggestion that the claims were not justiciable. *See Attorney General of Michigan ex rel. Kies v. Lowrey*, 199 U.S. 233, 239, 26 S.Ct. 27, 29, 50 L.Ed. 167 (1905); *Forsyth v. Hammond*, 166 U.S. 506, 519, 17 S.Ct. 665, 670, 41 L.Ed. 1095 (1897); *In re Duncan*, 139 U.S. 449, 461-462, 11 S.Ct. 573, 577, 35 L.Ed. 219 (1891); *Minor v. Happersett*, 21 Wall. 162, 175-176, 22 L.Ed. 627 (1875). See also *Plessy v. Ferguson*, 163 U.S. 537, 563-564, 16 S.Ct. 1138, 1148, 41 L.Ed. 256 (1896) (Harlan, J., dissenting) (racial segregation "inconsistent with the guarantee given by the Constitution to each

free and fair elections, could be coercive, and could reasonably undermine the reliability and outcome of elections where the government acts as a participant.

Moreover, it could be argued that when the government takes sides in an election, it gives a content or viewpoint based subsidy to those advocating the position the government chooses to side with. In the ordinary case of governmental action outside of an election, political controls can remedy citizen disagreement with governmental actions. Citizens can make their voices known at the ballot box in the next election by voting current officeholders out. Governmental electioneering, however, diminishes the effectiveness of the political response and threatens underlying constitutional values and democratic principles. The outcome of elections ideally should reflect the pure will of the people unpolluted by government electioneering. Where the political response cannot provide an adequate remedy, it can be argued that courts must step in.

Thus, I would hold that the Constitution requires governmental neutrality in elections — that is, the Constitution permits the government to educate and inform the public, but it may not cross the line into advocacy. Thus, government could provide factual information in newsletters and other forms of communication with the electorate. As the Supreme Court of California commented in *Stanson*, it would not always be easy finding the line of demarcation between informing and advocacy, but courts should look closely at the facts of each case, including the words used, the tone of the communication, the timing, and any other relevant factors. Moreover, government may provide equal access to a forum (as it does in so many other contexts) allowing both sides of the debate to advance their positions. Thus, a governmental newsletter such as the one at issue in this case could grant equal space to competing factions to make their best case to the electorate. This position, I think, would more appropriately reflective of the balance the Framers sought to strike in our democratic structure and goes a long way to ensuring that the true power remains with the people.

For these reasons, I must respectfully dissent from today's majority opinion.

---

State of a republican form of government").

More recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions. *See Reynolds v. Sims*, 377 U.S. 533, 582, 84 S.Ct. 1362, 1392, 12 L.Ed.2d 506 (1964) ("[S]ome questions raised under the Guarantee Clause are nonjusticiable"). Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some circumstances. *See, e.g.*, L. Tribe, AMERICAN CONSTITUTIONAL LAW 398 (2d ed. 1988); J. Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 118, and n., 122-123 (1980); W. Wiecek, THE GUARANTEE CLAUSE OF THE U.S. CONSTITUTION 287-289, 300 (1972); Merritt, 88 Colum. L. Rev., at 70-78; Bonfield, *The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude*, 46 Minn. L. Rev. 513, 560-565 (1962). We need not resolve this difficult question today."

Perhaps that day has come.